Keith ARCHIE; Rudy Askew; Raymond Del Valle; Percival Dennis; Cynthia Dilbert; Joyce Dorsey; William Farrior; Carlton Ford; Fitzroy Frederick; Miles Harp; Felicia Hart; Warren Hartshorn; Jay Hemphill; Derrick Johnson; William Johnson; William J. Johnson; Mona Lisa Larry; Gregory Lloyd; Frederick Mack; Ronald Manning; Mark McMillan; Regina Miller; Ernest Montgomery; James Moore; Dennis Novak; Nina Paul; Nathan Rhames; Jose Rodriguez; William Scott; David Solomon; Lee Springer; Zachary Suddith; Arnold Thornton; Stanley Turner; Tony Turner; Thelma Wall; James Whitman; Earl Williams; Jerome Williams; and Oscar Willis; on behalf of themselves and all others similarly situated, Plaintiffs,

v.

GRAND CENTRAL PARTNERSHIP, INC.; Grand Central Partnership Social Services Corporation; and 34th Street Partnership, Inc., Defendants.

No. 95 CIV. 0694(SS).

United States District Court, S.D. New York.

March 18, 1998.

Cleary, Gottlieb, Steen & Hamilton, New York, NY (Mitchell A. Lowenthal, Martha A. Lees, Yves P. Denizé, Jennifer L. Kroman, Of counsel), for Plaintiffs.

Leboeuf, Lamb, Greene, & MacRae, LLP, New York, NY (Molly S. Boast, Kenneth Moltner, Helen Marie Sweeney, Tracey Tiska, Of counsel), for Defendants.

### OPINION AND ORDER

SOTOMAYOR, District Judge.

Plaintiffs, formerly homeless and jobless individuals, allege that the defendants—the Grand Central Partnership, Inc. ("GCP"), the Grand Central Partnership Social Services Corporation ("SSC"), and the 34th Street Partnership, Inc. ("34th SP")—unlawfully paid them sub-minimum wages to perform clerical, administrative, maintenance, food service, and outreach work in the defendants' Pathways to Employment ("PTE") Program. Plaintiffs argue that the payment of sub-minimum wages allowed the defendants unfairly to underbid competitors who compensated their employees at lawful rates. Defendants maintain that the plaintiffs were not employees of the PTE Program, but were instead trainees receiving essential basic job skills development and counseling, and thus were not entitled to minimum wage payment.

Plaintiffs claim that the defendants violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, and the New York State Minimum Wage Act, N.Y. Labor Law § 650. They seek judgment that the plaintiffs were employees of the defendants and damages in the amount of back wages, liquidated damages, and reasonable attorneys' fees and costs.

For the reasons to be discussed, the Court finds that the defendants' program did provide the plaintiffs with some meaningful benefits. Nonetheless, despite the defendants' intent, they did not structure a training program as that concept is understood in case law and regulatory interpretations but instead structured a program that required the plaintiffs to do work that had a direct economic benefit for the defendants. Therefore, the plaintiffs were employees, not trainees,

and should have been paid minimum wages for their work.

The work the plaintiffs performed competed with other business enterprises paying minimum wages. Despite the attractive nature of the defendants' program in serving the needs of the homeless, the question of whether such a program should be exempted from the minimum wage laws is a policy decision either Congress or the Executive Branch should make. The defendants had the right to apply for an exemption from the minimum wage requirements of the FLSA and the New York Minimum Wage Act, and should have done so. The Court, however, cannot grant an exemption where one does not exist in law.

## FINDINGS OF FACT

I adopt as findings the following facts agreed upon by the parties in their Joint Pre–Trial Order:

### AGREED FINDINGS OF FACT

1. Plaintiffs in this action are all homeless or formerly homeless persons. When this case was filed on February 1, 1995, forty individuals had signed consent forms to become Plaintiffs and are named in the caption of this case: Keith Archie; Rudy Askew; Raymond Del Valle; Percival Dennis; Cynthia Dilbert; Joyce Dorsey; William Farrior; Carlton Ford; Fitzroy Frederick; Miles Harp; Felicia Hart; Warren Hartshorn; Jay Hemphill; Derrick Johnson; William Johnson; William J. Johnson; Mona Lisa Larry; Gregory Lloyd; Frederick Mack; Ronald Manning; Mark McMillan; Regina Miller; Ernest Montgomery; James Moore; Dennis Novak; Nina Paul; Nathan Rhames; Jose Rodriguez; William Scott; David Solomon; Lee Springer; Zachary Suddith; Arnold Thornton; Stanley Turner; Tony Turner; Thelma Wall; James Whitman; Earl Williams; Jerome Williams; and Oscar Willis.

2. Defendants have taken the depositions of nine Plaintiffs. They have received responses to interrogatories from an additional 33 Plaintiffs. They have received affidavits from seven Plaintiffs, all of whom submitted interrogatory responses and four of whom were deposed.

3. Defendant Grand Central Partnership ("GCP") is a New York not-for-profit corporation organized and existing under the New York State Not–For–Profit Corporation Law with its principal place of business at 6 East 43rd Street.

4. Defendant Grand Central Partnership Social Services Corporation ("SSC") is a not-for-profit corporation organized and existing under the New York State Not–For–Profit Corporation law, and has its principal place of business at 152 East 44th Street, New York, New York.

5. Defendant 34th Street Partnership ("34th Street") is a business improvement district ("BID") organized and existing under the New York State Not–For–Profit Corporation law.

6. The SSC runs a multi-service drop-in center for the homeless (the "drop-in center," the "Multi–Service Center," the "Center"), for which it receives funding from New York City pursuant to contract (the "City Contract"), among other funding sources. The SSC was formed in 1989 to take over from the Moravian Church the running of the Center. At the Center, the SSC operates the Pathway to Employment ("PTE") program.

7. Plaintiffs became homeless for a range of reasons. All of the Plaintiffs eventually learned of and visited the Center for homeless persons operated by the SSC.

8. The SSC's current City Contract mandates that the SSC "operate the Center to [serve] the target population." An average of 200 clients are to be served per day, and the Center is to "operate 24 hours a day, 7 days per week." Pursuant to the contract, the SSC provides counseling, referrals, clothing, showers, and mail access, to those clients wishing such services. The SSC contracts that its delivery of these services will meet the social service standards established by the City. The contract also requires the SSC to operate an outreach program to serve homeless people outside the Center and, if possible, help bring them in for additional services. The SSC is required to "operate

the Center with the purpose of resocializing clients, providing social services and rehabilitation services for clients with the goal of allowing clients to become appropriate for placement into alternative living arrangements."

9. The City Contract requires the SSC to "implement a Work Experience Program which will assist clients in developing alternate living skills for independent living." The Contract states that the "program shall aid clients in developing vocational skills for the purpose of future employment."

10. The City Contract provides funds for services to about 200 clients per day.

11. Homeless persons who visited the Center were known as "contacts" or "clients."

12. The Center allows any adult homeless person to become a client.

13. Upon arriving at the Center, clients usually were interviewed in a process known as "intake." The intake interviewer completed an Intake Interview form that asked where the client spent the last five nights, how he or she heard about the center, and what services the client requested.

14. Clients typically would also undergo another interview called an Assessment Interview. The form used with this interview asked for the client's family history, education, employment history, resources, legal history, medical history, mental health history, substance abuse history and housing history. The form also called for the interviewer to elicit the client's goals and asked the interviewer to provide an overall assessment and treatment plan for the client.

15. The SSC maintained a Self–Help Center at the Center, which contained various materials to assist clients in seeking a job.

16. The SSC identified individuals who had severe or chronic medical or mental health problems, or who otherwise needed to enter therapeutic programs or undergo intensive case management. Those individuals were referred to outside programs for certain services.

17. The SSC provided those clients who requested it counseling regarding substance abuse rehabilitation, housing, employment, entitlements, mental health, educational /vocational training, and family issues.

18. Some plaintiffs had mental health, physical health, or substance abuse problems, and some had limited work histories. Some had experienced periods of unemployment before coming to SSC.

19. The program that became known as PTE was started in 1989, and its structure has changed in some respects over time, but its basic elements and methods have remained consistent.

20. The PTE program was operated through the SSC and out of the SSC's offices.

21. Some SSC clients opted to join the PTE program. PTE participants were required to make arrangements for stable housing before entering PTE.

22. Once a participant entered the PTE program, he or she was assigned to one of five areas, all of which, directly or indirectly, contributed to the overall operation and goals of the Center. The five areas were maintenance, food services, administration, outreach and recycling (the recycling area was added in January 1993).

23. The PTE program required that an individual participate in the program for 40 hours per week. The target length of the program was 700 hours, but certain participants participated in the program for more than 700 hours.

24. SSC staff conducted various workshops, including workshops called "job readiness" and "motivational" workshops, designed for an audience that included PTE participants. Some such workshops covered areas such as how to prepare a resume, how to search help-wanted advertising, and how to interview for a job.

25. When individuals at the Center, including PTE participants, attended workshops, they were required to sign in.

26. Over the life of the PTE program, PTE participants received amounts ranging between $40 and $60 per week.

27. The maintenance department was responsible for the sweeping, mopping, occasional painting, repairing and cleaning of the Center.

28. The Food Services department was responsible for operating the drop-in center's kitchen, which served over 400 meals per day.

29. PTE participants in the administration department answered the telephone, filed, made intra-office deliveries, maintained lists, dispensed mail, and recorded information.

30. On one occasion a PTE participant in the administration department performed administrative duties for an entity outside the Center. From November 1990 to April 1991, Terence Weaver ("Weaver")—who became an Outreach supervisor in October 1994 and then coordinator of PTE from March 1995 to January 1996—was a PTE participant in administration. His participation took place at the Jewish Board of Family and Children's Services (the "Jewish Board"), an entity in the same building as the drop-in center. Among other things, Weaver compiled a resource list of 65 single room occupancies and information related thereto.

31. PTE participants were among those who performed outreach for the SSC.

32. Some PTE participants participated in the outreach program after midnight and before 6 a.m. because homeless individuals to whom outreach was directed were sleeping in public and private properties during those hours.

33. The SSC has a contract with the Port Authority of New York and New Jersey to provide recycling services at the World Trade Center. This contractual relationship, which began in 1993, provided another area where PTE participants could participate.

34. Outreach and recycling both generated revenues for the SSC. According to an SSC income statement for the fiscal year ending June 30, 1994, the SSC received around $950,000 from outreach and recycling contracts. These monies were used to cover the costs of performing outreach and recycling as well as to fund various SSC expenses, including those associated with the programs and activities of the Center.

35. At some point, the SSC began requiring PTE participants to produce three vouchers, each demonstrating attendance at a workshop, before they could receive their weekly amount.

36. Some PTE participants did not attend workshops even when such participation was required.

37. Staff members at the SSC maintained notes on some PTE participants on sheets with titles such as "Progress Notes."

38. In July 1993, the SSC began a video resume program, pursuant to which individuals seeking employment, including PTE participants and staff members, were videotaped and the tapes aired on television.

39. Between July 1993 and 1995, Lisa Davis, as the SSC's Employment Coordinator, sent a number of PTE participants on interviews for jobs outside the Center. Ms. Davis assisted clients in finding jobs outside the center, including by conducting practice interviews and contacting prospective employers. Ms. Davis maintained a report regarding her job placement efforts.

40. Some PTE participants were hired at minimum wage by the SSC as staff members following their participation in PTE.

41. Some PTE participants signed a document entitled "Pathway to Employment Enrollment Contract." Some PTE participants signed a printed document entitled "Grand Central Partnership Social Services Corporation Multi–Service Center PTE Letter of Agreement" which included the statement "I understand that I am not an employee of GCPSSC, and any stipend I receive for personal expenses related to my training is not considered a wage."

42. Both Daniel Biederman, the president of the GCP, and Ira Mandelker, a former Program Director of the SSC and a former Associate Director of the 34th SP, testified that PTE participants were not volunteers.

43. PTE does not constitute a "Work Experience Program" under New York City's "WEP" regulations. PTE is not a recipient of Job Training Partnership Act funds.

44. During 1990–1995, neither the GCP nor 34th Street possessed any document authorizing either BID to operate a training or a rehabilitation program.

### ADDITIONAL FINDINGS OF FACT

On the basis of the testimony[1] presented at the bench trial held on April 16 and 17, 1997, and the Exhibits admitted at trial, which are made a part of the record in this case, I find pursuant to Fed.R.Civ.P. 52, the following additional facts:

### I. *The Parties*

45. At one time or another between 1990 and 1995, each plaintiff participated in a work program that the defendants call the PTE program. Some of the defendants' officers and most plaintiffs referred to it as a "work program" or simply as a job. *See* Mandelker Dep. at 310 ("The term 'work program' has been regularly used as a shorthand for the Pathway to Employment Program."); Flynn Dep. at 54 ("[The PTE Program] was a work program."); Springer Aff. ¶ 2; Hart Aff. ¶¶ 2, 27.

46. As noted, defendant, 34th Street Partnership ("34th SP"), has its principal place of business at 6 East 43rd Street. *See* PE 62; PE 76 ¶ 11. 34th SP is an association of property owners of businesses located in the vicinity of Pennsylvania Station in Manhattan ("Penn Station"). Like the GCP, it assesses its members a fee and uses the proceeds to provide services within the Penn Station district.

47. The GCP, SSC, and 34th SP are all closely affiliated. The defendants share employees—including key executives—office space, and operations. Indeed, the GCP and 34th SP's controller consolidated the financial statements of the GCP and SSC and described the SSC as a "subsidiary" of the GCP. *See* Schaly Dep. at 28–30, 43–44 [David Schaly is the Controller and Assistant Treasurer for the GCP and the 34th SP]; Bieder-

man Dep. at 195; Mandelker Dep. at 546. Robert Hayes, an agent of the defendants who was commissioned by them to issue a report describing the SSC's activities, concluded that the SSC was a "subsidiary" of the GCP and that "the SSC has *become an entity resembling a department of the Grand Central Partnership.*" PE 32 (Hayes Report) at 14, 32 (emphasis added).

### II. *The Work Program*

48. For a period of time in 1994, participants in the PTE Program worked from the offices of the 34th SP. *See* Weaver Dep. at 154–55.

49. One element of the PTE Program that varied during the program's existence was the amount of time required to complete the program. Until early 1994 or early 1995, the program had a completion requirement of 700 hours of work over an indeterminate number of weeks ("the Completion Requirement"). *See* Crain Dep. II at 112–13; Mandelker Dep. at 113–14; Hart Aff. ¶ 53; Moore Aff. ¶ 10. Starting in or around March 1995, the Completion Requirement changed to approximately 40 hours per week for 20 weeks. Prior to that time, the Completion Requirement was 25 weeks. *See* Weaver Dep. at 104. Notwithstanding the various Completion Requirements, however, the SSC has always knowingly permitted many PTE participants to continue working in the Program indefinitely. *See* PE 33 (setting forth total accumulated hours of some PTE workers in the Program); PE 34 (same); Mandelker Dep. at 499–504 (explaining PE 34); West Aff. ¶ 1; Del Valle Aff. ¶ 31; Flynn Dep. at 175–78 (explaining PE 33). As a result, several plaintiffs accumulated over 700 hours of work in the program. *See* PE 34.

50. The PTE Program enabled the SSC to obtain significant revenue-generating contracts with outside corporations by underbidding businesses who compensated their em-

---

**1.** At trial, witnesses provided their direct testimony in the form of affidavits. "___ Aff. ¶ ___" refers to the paragraph in the affidavit of direct testimony of the designated witness. "Dep. at " refers to the page of the designated witnesses' deposition. " PE" refers to a plaintiffs' trial exhibit and "DE" to a defendants' trial exhibit. Defendants in their pretrial submissions objected either to the entire testimony of some witnesses or to portions thereof. If the Court cites an affidavit or deposition, it has overruled the defendants' objections.

ployees at higher rates. *See* Anderson Dep. at 19–20, 48–59 (Chase Manhattan Bank representative); Haddock Dep. at 29–30, 43–50 (Fleet Bank representative); PE 22 (contract between SSC and Fleet Bank). As agreed upon in paragraph 34 *supra* and according to an SSC income statement for the fiscal year ending June 30, 1994, the SSC generated over $950,000 in revenues from contracts to provide "outreach" and recycling services. It generated an additional $45,000 by providing laborers to The New York City Parks Department to work in Bryant Park in Manhattan. *See* PE 46; Schaly Dep. at 78–79 (explaining certain line items of SSC income statements), 99–100 (explaining SSC's services to Parks Department). These revenues were used not only to pay certain expenses incurred by the drop-in center, but also to pay the salaries of some of defendants' officers. *See* Schaly Dep. at 83–35; Grunberg Dep. at 132–34; PE 47 (Transcript of the Minutes of the Committee on General Welfare of the New York City Council ("City Council Transcript")) at 130–31 (testimony of SSC Executive Director Jeffrey Grunberg). Daniel Biederman, President of the GCP and 34th SP, is paid $335,000 per year for heading the GCP, 34th SP, and one other BID, the Bryant Park Restoration Corporation. *See* Biederman Dep. at 209. Jeffrey Grunberg, Executive Director of the SSC and 34th SP's Vice President of Social Services, is paid over $127,000 per year. *See* Grunberg Dep. at 188–89. In addition, the PTE Program permitted the GCP and 34th SP to meet their designated business objectives of keeping the midtown Manhattan area safe and clear of homeless persons. *See* Biederman Dep. at 57–59, 74; PE 35 (letter of Jeffrey Grunberg).

### A. Operation of the Work Program

#### i. Pre–Hearing Events

51. Most clients discovered the PTE Program soon after arriving at the drop-in center. *See* Hart Aff. ¶¶ 19–24, Springer Aff. ¶ 8; Moore Aff. ¶ 10.

52. The intake interview with new clients usually lasted only a few minutes. *See* Hart Aff. ¶ 28; Del Valle Aff. ¶ 10. Among other things, clients were asked about any specific services they wished to obtain from agencies outside the SSC. No meaningful assessment of the client's employment history or job training needs was made during the intake interview. *See* Hart Aff. ¶ 28; Brown Aff. ¶ 33 ("I asked the contact whether they needed any services. No assessment of the client's employment history or job training needs was made during the intake interview.")

53. Within a few days of the initial intake interview, clients were expected to have a second interview lasting no more than one hour. During the second interview clients typically were asked about their personal goals. Some clients were asked about their general work history, and whether they were interested in a training program or a job program. *See* Hart Aff. ¶¶ 26–29.

54. During the second interview, some clients also were asked what they sought from the SSC. Several plaintiffs responded that they were seeking a job. *See* Hart Aff. ¶ 29; Brown Aff. ¶ 6; Del Valle Aff. ¶ 11; Springer Aff. ¶ 8.

55. Some plaintiffs were not interviewed, but nevertheless learned about the Program through word of mouth. In or around November 1993, for example, plaintiff Lee Springer arrived at the SSC's center, where he was "hoping to find another job." Soon thereafter, Springer learned from others at the center that there were positions available in the SSC's kitchen. Springer, who already had substantial experience in cooking and general kitchen work, approached the SSC's kitchen supervisor, Ivan Anthony, and "told him that [he] was looking for a job." Anthony acknowledged that there were job openings in the SSC's kitchen, and stated that after 20 hours of unpaid service, Springer would receive a kitchen job that paid $50 per week. *See* Springer Aff. ¶¶ 8–9, 12.

56. Not every homeless client who arrived at the drop-in center was qualified to work in the Work Program. The SSC routinely screened out individuals who had severe or chronic medical or mental health problems, or who otherwise needed to enter therapeutic programs or undergo intensive case management. Those individuals were

referred to outside programs. *See* Mandelker Dep. at 142–43. In addition, such clients received a yellow card that allowed them to be in the center for only limited periods of time. *See* Hart Aff. ¶ 20.

57. By contrast, clients who were deemed mentally and physically fit for work and who expressed an interest in obtaining a job in the PTE Program were permitted to remain in the center and obtain a "blue card" identifying them as members of the center. *See* Hart Aff. ¶ 20; Moore Aff. ¶ 11. Clients who displayed initiative and an intention to "go back to work" were qualified to participate in the PTE Program. *See* Flynn Dep. at 122–23; Brown Aff. ¶ 35.

58. In the PTE Program's early years, participants were asked to sign a document that described the Program as a twelve-week program divided into three phases, each lasting four weeks. According to the document, PTE participants were to work 40 hours each week during the first phase followed by phases that would involve some "training" component and seminars. *See* PE 20 ("Throughout the first phase, [the PTE participant] will be given a 40 hour work week. Throughout the second phase, [the PTE participant] will be given a 32 hour work week and 8 hours of required training. Throughout the third phase, [the PTE participant] will be given a 24 hour work week and 16 hours of required training; seminars; interviews; and interview feedback meetings.")

### ii. *Post–Hiring Events*

59. The SSC recorded the "date of hire" of PTE participant, and in some cases created a special list of hiring dates for PTE workers. *See* PE 72; Flynn Dep. at 181. Thereafter, a PTE participant was assigned to a specific work location within one of the departments. Each PTE participant was expected to work the next day on his or her assigned shift. In general, PTE participants were assigned to departments based on the needs of the SSC rather than the needs of the participant. *See* Brown Aff. ¶¶ 10, 56; Springer Aff. ¶ 8; Archie Aff. ¶ 13; Del Valle Aff. ¶ 12.

60. PTE participants in all departments were assigned to work 8–hour shifts. Their regular workweek was five days per week, for a total of 40 hours. *See* Moore Aff. ¶ 17; Brown Aff. ¶ 13; Hart Aff. ¶ 35; Springer Aff. ¶ 10; Flynn Dep. at 77, 125–26.

61. In addition to registering their hiring dates, the SSC and the 34th SP attempted to record the total number of hours that PTE participants worked. According to plaintiffs' recollections and defendants' own calculations, several plaintiffs worked well over 700 hours—and some for more than 1000 hours—in the PTE program before leaving, being terminated or being promoted to a staff position. *See* Springer Aff. ¶ 19 (1,500 hours); West Aff. ¶ 1 (1,400 hours); Hart Aff. ¶ 52; Del Valle Aff. ¶ 31; *see* PE 33, 34 (defendants' calculations of the total number of hours worked by PTE participants as of June 1994).

62. At all relevant times, PTE participants who were unable to work on their assigned shifts were required to provide a bona fide excuse and to complete a PTE excused absence sheet. *See* Hart Aff. ¶ 48; PE 5 (PTE excused absence sheet); PE 36 (memorandum describing "Administrative PTE Procedures"); PE 17 ("PTE enrollment contract").

63. As noted, the SSC generally compensated PTE participants at a rate ranging from $40 to $60 per week for a 40–hour work week, or $8 to $10 per eight-hour day. This amounts to approximately $1 to $1.50 per hour worked. PTE participants were paid no more than $1.50 per hour, however, for the work they performed in each of the PTE departments. *See* Mandelker Dep. at 192–94, 200.

64. PTE participants who worked fewer than 40 hours in one week had their pay reduced by a corresponding amount. *See* Moore Aff. ¶ 20; Hart Aff. ¶¶ 45, 48–49; Brown Aff. ¶ 44.

### B. *Job Tasks In The Work Program's Departments*

65. According to several PTE participants and the defendants' own documents, virtually all of the drop-in center's day-to-day maintenance and outreach, much of the food preparation, and some of the clerical work

was done by PTE participants. *See* PE 37; PE 38; Moore Aff. ¶¶ 13–14, 16, 24; Brown Aff. ¶ 14; Hart Aff. ¶¶ 33, 37–38; Archie Aff. ¶ 17.

66. PTE participants in the maintenance department performed almost all the basic janitorial and maintenance work needed for the SSC's offices, including repairs, fixing light fixtures, painting, mopping floors, cleaning hallways, offices and bathrooms, removing garbage, stacking and unstacking chairs in the drop-in center gym and washing the uniforms worn by staff and PTE participants. *See* Archie Aff. ¶¶ 16–17; Hart Aff. ¶ 62; Moore Aff. ¶ 24; Biederman Dep. at 103. PTE maintenance participants also performed tasks for the GCP. *See* Biederman Dep. at 49. PTE maintenance participants were assigned to all three 8–hour shifts, including the "graveyard shift" from midnight to 8 a.m. *See* Hart Aff. ¶ 64; PE 39 (PTE maintenance participant's time card and overtime slips indicating work on midnight to 8 a.m. shift). To the extent that staff worked in the maintenance department, PTE participants performed the same job tasks as those staff members, who were paid minimum wage or more. *See* Hart Aff. ¶¶ 62–63; Archie Aff. ¶ 17; Moore Aff. ¶ 23.

67. PTE participants in the food service department helped prepare over 400 meals each day in the SSC's kitchen, traveled to the market to help purchase food products, loaded and unloaded food, assisted the food services director with general chores around the kitchen, cooked, washed dishes and removed garbage from the kitchen. *See* Springer Aff. ¶ 14. PTE participants performed the same job tasks as staff members—other than the department head—who worked in food preparation and were paid minimum wage or more. *See id.* at ¶ 15.

68. PTE participants in the administration department performed various clerical tasks at the drop-in center, including general office work. *See* Grunberg Dep. at 85–86. At the drop-in center's Assessment and Referral Center or "self-help center," PTE administrative participants assisted homeless clients—who were not PTE participants—in finding resource materials on file and distributed paper and pencils. *See* Mandelker Dep.

at 313. Some performed even more substantive work. For example, James Moore was a PTE administrative participant from Spring through Fall of 1994. Moore's administrative duties included significant interaction with homeless clients at the drop-in center who were not participants in the Work Program. Among other things, Moore ran orientation sessions, informed homeless clients who had arrived at the center about welfare and social security benefits, and helped clients look for temporary or permanent jobs outside the center. *See* Moore Aff. ¶¶ 13–14, 16.

69. PTE participants also worked in a clerical capacity at the 34th Street SP. *See* Mandelker Dep. at 541, 543–44.

70. PTE participants in the outreach department acted as either stationary or roving patrol guards for ATM vestibules in and around the Grand Central Station area and the Pennsylvania Station area in midtown Manhattan, as well as many other parts of Manhattan, and parts of Queens. *See* Flynn Dep. at 64; Brown Aff. ¶ 14; Del Valle Aff. ¶¶ 25–26; Hart Aff. ¶ 32.

71. Stationary patrol guards stayed inside the same site—either a vestibule, a building or premises such as Penn Station—for an entire shift. By contrast, roving or "mobile" guards were responsible for monitoring several ATM vestibules in one shift. *See* Del Valle Aff. ¶¶ 25–26; Hart Aff. ¶ 32; Brown Aff. ¶¶ 14, 27. In addition to their monitoring and protection duties, PTE outreach participants were responsible for monitoring and cleaning ATM vestibules. *See* Hart Aff. ¶ 33; Brown Aff. ¶ 18.

72. Vincent Flynn, the Director of Outreach, testified that the terms "stationary guards" and "regular patrol guards" in Plaintiffs' Exhibit 40 refer to PTE participants. PE 40; *see* Flynn Dep. at 158–60. The schedule lists each Chemical Bank branch location outreach participants were responsible for guarding, whether the location was to be guarded by stationary guards or mobile patrol guards, and the hours and days of coverage. *See* PE 40.

73. As explained in marketing letters sent out by senior SSC officers Grunberg

and Schiazza, the objective of the outreach program was to "present a safe environment" for customers at these premises. *See* PE 31; PE 35.

74. The SSC monitored premises in addition to bank ATM vestibules. It contracted to perform similar monitoring services for, among others, the National Railroad Passenger Corporation at Penn Station, the Tudor City Residents Association, the New York Community Trusts Parks Projects and certain corporations, such as the Philip Morris building, and buildings managed by the Edward S. Gordon Company. *See* Answer ¶ 25; Berger Aff. ¶¶ 7–10. The SSC assisted these and other corporations with their "homeless problems" by hiring PTE participants and staff workers to clear homeless persons from their vestibules and buildings. *See* PE 35. PTE participants were instructed to clear homeless people out. PTE participants were told to ask homeless persons to voluntarily leave ATM vestibules and buildings. Nevertheless, if a homeless person refused to leave voluntarily, the PTE participant was to remove the homeless person "by any means necessary" including through physical intimidation and violence. *See* Brown Aff. ¶ 25; Del Valle Aff. ¶¶ 25–26; PE 77 (Review of Findings of U.S. H.U.D. Investigation of the SSC) at 9 (H.U.D. noted, among other things, that defendants' "outreach efforts were carried out by formerly homeless individuals with minimal training. Supervision was also seriously lacking. The GCP's outreach methodology evidenced a reckless disregard for the inherent dangers resulting from this type of operation").

75. PTE participants in "mobile" outreach were responsible for approaching homeless persons and informing them that they could obtain shelter at a drop-in center operated by the SSC. If a homeless contact at first refused to leave, the outreach participant called for additional outreach participants to persuade the homeless person into leaving. *See* Brown Aff. ¶¶ 17, 25, 57. On the other hand, if the guard's first approach proved successful, the homeless contact was escorted to the drop-in center. *See* Brown Aff. ¶ 30.

76. PTE outreach participants sometimes drove the vans used to transport homeless contacts from the mobile site to the SSC's offices. *See* Brown Aff. ¶ 30; Flynn Dep. at 71.

77. Some PTE participants worked in the outreach base office, located at the SSC's headquarters. Those PTE participants helped to coordinate the outreach routes for PTE participants and staff members. They also were responsible for ensuring that all routes were adequately covered by SSC personnel, including PTE participants, and for keeping track of work hours, overtime, and absences of both participants and staff. *See* Del Valle Aff. ¶ 17–18; Hart Aff. ¶¶ 37–41, 47–49; Brown Aff. ¶ 32.

78. A few PTE participants, including Tracey Randall, Leonard West, Crystal Henderson and Walter Brown, also worked as base supervisors in the outreach base office. According to Mandelker, "[a] base supervisor was an employee that was stationed at the home base of the Outreach Program." *See* Mandelker Dep. at 414. PTE participants in the outreach base office also took calls on a "hotline" from banks and stores that had a "homeless problem of people hanging out inside or hanging in front of the[ir] place." *See* Flynn Dep. at 68.

79. In addition to distributing uniforms to outreach participants, quartermaster room PTE participants cleaned, ironed, and issued uniforms and retrieved them at the end of each shift. *See* Flynn Dep. at 88; Hart Aff. ¶ 34.

80. Most of the outreach participants employed by the SSC were PTE participants. According to a November 1993 memorandum from Vincent Flynn, then Director of Outreach, to Frank Schiazza, PTE participants constituted 63 of the 85 outreach participants responsible for guarding ATM vestibules and the like. *See* PE 41; Flynn Dep. 186–94 (explaining PE 41). Sixty to seventy percent of outreach participants were trainees. *See* PE 32 at 40. There were not enough staff participants to cover all the outreach locations. Accordingly, PTE outreach participants were assigned to all three 8–hour shifts, including the "graveyard shift" from midnight to 8 a.m. *See* Flynn Dep. at 83–84;

Del Valle Aff. ¶¶ 25, 28; Brown Aff. ¶¶ 37, 55; Hart Aff. ¶ 67.

81. PTE participants who performed stationary and patrol outreach and who worked at the outreach base office performed the same job tasks as their co-participants who were staff members in the outreach program. *See* Hart Aff. ¶ 57–58; Del Valle Aff. ¶ 27; Brown Aff. ¶ 51.

82. PTE participants also worked at the World Trade Center recycling program. Like staff workers who worked in the recycling program, their responsibilities included collecting and sorting papers that were to be picked up for recycling. *See* West Aff. ¶ 8.

83. On occasion, PTE participants were employed to work on non-outreach and non-administrative "special assignments" for outside companies. These special assignments arose out of agreements pursuant to which the GCP, the SSC or the 34th SP agreed to provide temporary laborers at a per hour rate. For example, in 1993 and 1994, the SSC entered into an agreement with Seventh on Sixth, Inc. ("7th on 6th"), a corporation that sponsors biannual fashion shows in Bryant Park in Manhattan. Each year 7th on 6th requested, and the SSC agreed to provide, "homeless outreach participants" to employ before and during the fashion show. *See* PE 42 (1993); PE 43 (1994); PE 44. The laborers' tasks involved "heavy labor," including unloading chairs, setting up barricades for the show and unloading and transporting boxes of fashion products. *See* PE 42, 43; Hart Aff. ¶ 40. Most of the laborers who performed these tasks were PTE participants. *See* Hart Aff. ¶ 40; Brown Aff. ¶ 47. The SSC also provided two outreach participants both before and during each show who were responsible for clearing the park of homeless persons. *See* Brown Aff. ¶ 47; PE 42; PE 43. In 1993 and 1994, the SSC paid PTE participants only $1 per hour for providing services to 7th on 6th in connection with the fashion show. In at least one case in 1994, the SSC had assured PTE participants that they would be paid $4.25 per hour, the then minimum wage, on the fashion show assignment but later reneged and paid them the lesser PTE wage. *See* Hart Aff. ¶ 40; PE 2. By contrast, according to a letter from

the SSC to 7th on 6th which sets forth billing rates for providing services, the SSC was paid $5.50 per hour per participant by 7th on 6th in 1994. *See* PE 44.

84. PTE participants were sometimes sent on special assignments in circumstances unrelated to their regular departmental work. For example, some PTE participants were sent to work at Bryant Park in Manhattan to pick up garbage. *See* Mandelker Dep. at 322–23; PE 45 (expense signature sheet for PTE participant dated 6/15/93 stating that participant "worked six days this week in Bryant Park taking out garbage"). One PTE participant worked as a doorman/outreach guard for the Oyster Bar. *See* Archie Aff. ¶¶ 10–16.

### C. *Supervision of PTE Participants*

85. According to both PTE participants and SSC's staff members, PTE participants often received little or no supervision while they performed their tasks. In testimony before the City Council of the City of New York's Committee on General Welfare in May 1995, Jeffrey Grunberg, the SSC's executive director, stated the following with regard to supervision and training of participants engaged in outreach: "Once they were out in the street, they would be supervised or monitored by someone. They would stick with someone for two or three days, depending on the person. That would be it." PE 47 (City Council Transcript) at 137–38.

86. Vincent Flynn, the Director of the Outreach Program, testified that PTE outreach participants typically were accompanied and supervised by either a staff member or another PTE outreach participant for their first three tours before they conducted outreach alone. *See* Flynn Dep. at 76–79. PTE outreach participants confirm that they received supervision from a staff member or another PTE participant for at most the first few days of their outreach work. Thereafter, other than periodic short visits from shift or "field" supervisors once or twice each shift, they were left alone. *See* Brown Aff. ¶¶ 18, 25; Del Valle Aff. ¶¶ 21–24, 27–28.

87. PTE outreach participants in the base office and the quartermaster room received

little oversight from staff. *See* Hart Aff. ¶ 37; Brown Aff. ¶ 32.

88. Robert Hayes, the agent retained by the defendants to evaluate the PTE program, concluded that "the recruitment, training and supervision of SSC outreach participants was inadequate." Hayes Report at 4 (PE 32). He also conceded that "detailed training was not provided in specific methods of engaging individuals," *id.* at 38, and that "training for [SSC's] outreach participants was often rudimentary . . . and at times was partially sacrificed because of the need to have sufficient numbers of outreach participants to satisfy bank contracts." *Id.* at 45. Hayes even quoted an "outreach director" as admitting that "the pressure to fill outreach posts under contract with banks at times forced reliance on untested trainees to work one-on-one with homeless persons" and that "training was haphazard." *Id.* at 46.

89. PTE participants in maintenance similarly received little supervision from staff members. *See* Archie Aff. ¶ 17. Several PTE participants in other departments observed PTE participants in maintenance working alone in the center without a supervisor. *See* Hart Aff. ¶¶ 62, 65; Moore Aff. ¶ 24; Brown Aff. ¶ 54.

90. Defendants also provided PTE participants in food service and administration with little meaningful, close supervision. *See* Springer Aff. ¶ 15; Moore Aff. ¶ 19.

91. Some staff members received extensive supervision and "training," and received minimum wages. For example, as a staff member in the summer of 1994, Felicia Hart received considerable supervision from Lisa Davis, then the SSC's Church Bed Coordinator and Employment Coordinator and Hart's immediate superior. *See* Davis Dep. at 67–68. Hart was also taught how to use a computer. Both experiences were in stark contrast to Hart's experience in the PTE program. *See* Hart Aff. ¶¶ 59, 61. Although Davis testified that she provided "training" when Hart was a PTE participant, *see* Davis Dep. at 85–88, Hart was in fact a staff participant by that summer. *See* Hart Aff. ¶ 56.

### D. *Evaluation of PTE Participants*

92. Each PTE participant was to receive a written performance evaluation variously entitled a "Pathway to Employment Weekly Personnel Evaluation," "Work Program Weekly Personnel Evaluation" or a "Pathway to Employment Monthly Participant Performance Rating." *See* PE 48 (miscellaneous evaluations); Mandelker Dep. at 467, 469–71. In or around May 1993, the PTE participant evaluations were required to be completed on a biweekly rather than a weekly basis due to the large number of PTE outreach participants. *See* PE 51. Despite the formal requirement, several PTE participants never or rarely received a written job performance evaluation. *See* Brown Aff. ¶ 48.

93. PTE personnel evaluations were completed by departmental managers. Tellingly, the evaluation form referred to the PTE member as a "worker," and the form called for an evaluation of the "worker's" job performance. The evaluation required the manager to note the department in which the PTE participant worked. Each PTE participant was rated based on seven categories. The performance categories included "attendance," "compliance with rules and authority," and "productivity." *See* PE 48. With respect to each category PTE participants could be rated as either "below," "fair," "average," or "excellent." Each of these ratings in turn had a corresponding range of numerical scores. A rating of "fair" warranted a score of five to seven, while a rating of "excellent" in any category corresponded to a score ranging from 15 to 20. The highest possible total performance score was 140. Later, the form was changed to reflect the point average. The highest possible point average was 20. *See* PE 50.

94. The evaluations for PTE participants make no reference to training or to the PTE participant's ability to learn new skills. Although the evaluations provided for additional written comments, none of the comments on the evaluations produced by the defendants refer to "training" of PTE participants or to a PTE participant's ability to develop new skills necessary to function in jobs with outside entities or at the SSC. *See* PE 48.

## E. Time Cards and Time Sheets

95. Typically, the PTE Program day was divided into three eight-hour shifts. PTE participants were expected to work on an assigned shift at least eight hours per day, five days per week, for a total of forty hours per week. PTE participants were paid based on their total number of hours of work each week. As noted, for the first 40 hours of work per week, all PTE participants were paid $1 per hour, although for a time PTE participants were paid $1.25 per hour, or $50 per week. As a general matter from 1992 until the late fall of 1993, PTE participants were paid "time and a half"—or $1.50—for overtime hours beyond 8 hours per day. See Brown Aff. ¶ 36; Del Valle Aff. ¶ 15. After 1993, however, the overtime was credited to the total hours needed to be promoted to a staff job paying minimum wage.

96. Since PTE participants' weekly pay was based on the number of hours worked, the SSC attempted to record accurately the number of hours that each PTE participant worked each day. In order to do so, the SSC distributed weekly time cards to PTE participants in each department. PTE participants were informed that they were required to use the time cards while they worked in the Work Program. See Hart Aff. ¶ 43; Del Valle Aff. ¶¶ 17, 19; Brown Aff. ¶ 11; Springer Aff. ¶¶ 10–11; Moore Aff. ¶ 18.

97. Each time card noted the PTE participant's name, department and shift. At the start of a shift, each PTE participant was required to use his or her time card to "punch in" to a time clock, which noted the date and time the PTE participant arrived. Similarly, PTE participants "punched out" using a time clock at the end of their shift. The date, start time and end time were noted on the card's right-hand column. When the time clock malfunctioned, departmental managers were responsible for writing in the start time and end time. They were supposed to initial each entry to verify that the PTE participant had in fact arrived for his or her shift. The PTE participants' total hours for the week were usually written down and circled in the left column. In some instances, time cards indicated the number of hours that were "overtime" with "O.T." next to

those hours. See Hart Aff. ¶ 47; Brown Aff. ¶ 41; PE 12 (Walter Brown time card indicating "OT 8" on bottom left corner).

98. It was the SSC's policy and practice to have a departmental supervisor and the senior supervisor—for example, Ira Mandelker—review and initial the time card at the end of the week. The supervisors' initials cleared the way for the PTE participant to be paid for his or her regular hours and overtime hours as reflected on the time card. See Brown Aff. ¶ 42; Hart Aff. ¶ 47.

99. Some PTE departments also required that supervisors complete weekly "Work Program Time Sheets" to record the time PTE participants worked each week. See Mandelker Dep. at 250–51; PE 4; PE 9; PE 15.

100. Time sheets reflected the total number of hours worked by a PTE participant in any given week, as well as the number of hours worked each day, including the participant's "time in" and "time out." The time sheets also had a space entitled "work performed" by the PTE participant. In addition, departmental managers were responsible for initializing each day's time sheet entry. In the outreach department in 1992 and 1993, plaintiffs Tracey Randall and Crystal Henderson, both PTE participants, often undertook these duties in place of the base supervisor. See Del Valle Aff. ¶ 17. Similarly, as a PTE participant, plaintiff Felicia Hart signed the "supervised by" line of time sheets for fellow PTE participants. See Hart Aff. ¶ 48; PE 4.

101. Time cards and time sheets were also used by staff members who worked for the GCP, SSC and 34th SP in the areas of food preparation, outreach, maintenance, administration and recycling. In one instance, for a staff worker, the term "work" in the "work program time sheets" was crossed or whited out and replaced with the term "staff." See Springer Aff. ¶ 20; PE 25.

102. Although the SSC claims that using time cards and time sheets for staff members and using them for PTE participants had different purposes, the purposes were in fact the same: to obtain "[an] actual accounting of the time an individual expends working for the [SSC or 34th Street] to produce a payroll

that reflects that person's records [and] that reflects that person's work." Mandelker Dep. at 252–53 (describing purpose of staff time cards). As PTE participants were told at the start of their employment, PTE Program time cards and time sheets permitted the SSC to "record the time" and "verify the[] hours" of PTE participants to ensure that they received full payment for those hours. Flynn Dep. at 199, 206; Brown Aff. ¶ 22; Del Valle Aff. ¶ 17; Moore Aff. ¶ 18; Hart Aff. ¶ 43–45.

### F. *Displacement of Regular Employees: Overtime and Back–To–Back Shifts*

103. PTE participants often performed the same tasks as staff employees. The SSC was aware of and routinely approved of PTE participants working overtime hours—that is, hours worked beyond 8 hours in a single day or 40 hours in a single week—in order to fill in for staff employees who failed to appear for their shift. In short, the SSC frequently used both overtime and back-to-back shifts by PTE participants to cover for absent staff participants, to do additional work as needed by the SSC, and in general to compensate for a shortage of personnel both inside and outside the center. The hours that counted as overtime were noted on a PTE participant's time card and time sheet. At all relevant times, overtime "slips" were attached to these time cards and time sheets to indicate a PTE participant's overtime. *See* Mandelker Dep. at 384–85; Hart Aff. ¶ 47–48; Brown Aff. ¶ 40. Vincent Flynn completed overtime slips for PTE outreach participants "when they worked an extra tour" on outreach. *See* Flynn Dep. at 117; Brown Aff. ¶ 41.

104. Unlike time cards and time sheets, however, overtime slips recorded not only the hours of overtime a PTE participant worked any given day, but also the "reason for the overtime." Each overtime slip had to be authorized by a supervisor and approved by a senior supervisor with authority to approve overtime. In some cases, the same supervisor signed the overtime slip twice if he or she had authority to do so. *See* Hart Aff. ¶ 47–48; Brown Aff. ¶ 40.

105. PTE participants worked overtime when the need arose for more participants either at the SSC's center or in outreach. *See* Hart Aff. ¶ 41; Brown Aff. ¶¶ 37–38; Moore Aff. ¶ 20; Springer Aff. ¶ 17; Del Valle Aff. ¶¶ 29–30.

106. According to overtime slips produced by the defendants, overtime hours often were due to a "shortage of personnel" or because a department was "short of help." *See* PE 52. Flynn testified that these stated reasons for PTE overtime were plain, namely, that the SSC "had a shortage of personnel. If you wanted to work, you worked." Flynn Dep. at 199. Plaintiff Walter Brown testified that "shortage of personnel" as it appeared on his overtime slips "meant that a staff member or PTE program participant was absent on a route for another shift, and [he] was asked to replace the absent participant." Brown Aff. ¶ 40; *see id.* ¶¶ 37–38.

107. Some overtime slips were more specific about the reason for the overtime. For example, the overtime slips for plaintiff Floyd Johnson state that overtime was needed because there was a "no show for bathroom staff" and "extra work needed in bathroom." PE 52. Johnson was a PTE participant at the time the overtime slips were completed, during the week ending March 23, 1993. *See* Mandelker Dep. at 362–63. According to a chart listing PTE participants on that date, plaintiff Timothy Wise was a PTE maintenance participant on or around September 29, 1993. *See* PE 53. Wise worked eight hours of overtime on the midnight to 8 a.m. shift. *See* PE 39. The handwritten notation next to "reason for overtime" on the slip states "coverage for participant that did not show." *Id.* According to Ira Mandelker, the supervisor who signed Wise's slip, the "worker" for whom Wise covered on September 29, 1993, could have been either a staff member or a PTE participant. *See* Mandelker Dep. at 418–19.

108. Plaintiff Tracey Randall was an outreach participant in the PTE program from at least March 1993 to approximately January 1994. *See* Flynn Dep. at 184–85. In 1993, Randall worked primarily at the outreach base office, where she coordinated routes and ensured that outreach participants had the necessary equipment and documents to perform their outreach work. *See*

Brown Aff. ¶ 38. According to her time cards and time sheets, her regular shift was alternately from 8 a.m. to 4 p.m. and from 4 p.m. to midnight, Tuesday through Saturday. *See* PE 74 (Randall PTE Program time cards); PE 75 (Randall Work Program time sheets). Her regular days off—or "R.D.O.'s," as the outreach office referred to them—were Mondays and Sundays. However, she often worked on the midnight shift. *See* Hart Aff. ¶ 41. Vincent Flynn, Randall's immediate superior at the base office, considered her an "excellent" participant. Flynn Dep. at 184. According to the SSC's own records, between January 1, 1993 and November 1993, Randall accumulated a total of 1,131 hours in outreach. *See* PE 33 (at Bates stamp number D22666); Flynn Dep. at 184–85 (explaining that plaintiffs' Exhibit 33 indicates Randall's total accumulated hours in outreach as an outreach participant starting from March 6, 1993).

109. According to her time card for the week ending August 3, 1993, Randall worked 81 hours from Wednesday, July 28 to Tuesday, August 3, 1993. *See* PE 54 (time card). Randall's overtime slips for that week were signed by Flynn. *See* PE 55 (overtime slips). Her overtime slips corroborate the hours of work that appear on Randall's time card for that week. First, her regular forty hours of work as a PTE outreach participant plus the total hours of overtime indicated on the overtime slips adds up to 81 hours. Moreover, according to her time card, Randall had the following schedule from July 30 through July 31: she worked back-to-back shifts from 3:44 p.m. to midnight on July 30 and from midnight on July 30 to 8:42 a.m. on July 31; she was credited for an extra hour of work on the morning of July 31 because the staff member at the base office who was supposed to relieve her arrived late for his shift; she returned to the base office at 11:44 p.m. on July 31 to work on the midnight to 8 a.m. shift. *See* PE 54. Her overtime slip dated July 30, 1993 shows that she was credited for nine hours of overtime work, and corresponds to the midnight to 8 a.m. shift from July 30 to July 31. Her overtime slip dated July 31, 1996, reflects the overtime for which she was credited for working the midnight to 8 a.m. shift on Sunday, her day off. Her overtime slip dated August 2, 1996, reflects the eight hours of overtime she received for working on Monday, her other day off. *See* PE 55.

110. Randall's overtime hours often came about because she was asked to replace a staff person who was absent in the base office. On more than one occasion, the absent staff person on a shift was the outreach base supervisor, whose duties Randall assumed for that shift because she was familiar with the supervisor's work. *See* Brown Aff. ¶ 31. As a result, one of Randall's overtime slips states "No base supervisor" as the reason for overtime. PE 55.

111. Walter Brown's testimony confirms that "shortage of personnel," as the reason for overtime on overtime slips, refers to the situation in which either a PTE participant or a staff member was absent, and he was asked to replace the absent participant. *See* Brown Aff. ¶ 40. In summary, although the defendants at trial argued that most PTE participants voluntarily chose to work overtime to have a place to stay and socialize, the Court finds that the work performed was necessary work for the functioning of the program and not to satisfy the desires of the participants.

### G. *PTE Payrolls: Contemplation of Compensation*

112. At all relevant times from 1991 through 1994, PTE participants were placed on a payroll. In 1991, the payrolls listed the name and department of each PTE participant, followed by his or her total pay for the week. *See* PE 56 (payroll sheets). The payroll form changed after 1991, but its gist remained the same. Work program or "WP" payrolls for each week listed the name and department of each PTE participant, the regular and overtime (or "additional") hours worked by each participant, any additional amount owed due to a "special assignment," and the participant's total pay for that week. *See* PE 57–59. Defendants also prepared department by department payrolls. *See* PE 60.

113. PTE participants were paid each Friday. Before they were paid they attend-

ed a short meeting during which they signed a PTE payroll "signature" sheet that indicated their total pay, including overtime. *See, e.g.,* PE 53. PTE participants who failed to "pick-up" their payment the previous week were required to sign a "pick up" sheet the following week. *See* Hart Aff. ¶ 51. Both staff and PTE participants routinely called Fridays "pay day" and referred to the money PTE participants received for their work as "pay." *See* Hart Aff. ¶ 51; Archie Aff. ¶ 6; Moore Aff. ¶ 22. The SSC has routinely and consistently used the term "pay" to refer to PTE participants' weekly wages. Thus, the "Work Program Enrollment Form" the SSC used in or around 1991 for plaintiff Keith Archie clearly refers to his $40 per week wage as "pay." *See* Archie Aff. ¶ 9; PE 19.

114. None of the plaintiffs who have testified believed that he or she was a volunteer. Plaintiffs worked in contemplation of compensation for the work they performed in the defendants' Work Program. Plaintiffs believed that the Work Program was a job, and they expected to be paid for it. *See* Moore Aff. ¶ 22; Brown Aff. ¶ 12; Hart Aff. ¶ 52; Springer Aff. ¶ 12; Archie Aff. ¶ 5.

115. Vincent Flynn, the former Director of Outreach, himself referred to PTE participants as "employees" in a document that described the outreach program and welcomed new PTE hires. *See* PE 61; Flynn Dep. at 173–75. The document was distributed to new PTE hires in outreach. Flynn Dep. at 167. It outlines the outreach program's "objectives for it's [sic] employees." The document states that non-PTE participants could "volunteer" to do outreach without pay. Thereafter, however, the PTE "employee" was expected to "elevate to our Work Program status for twelve weeks" and "complete all job task[s] successfully." PE 61; Flynn Dep. at 171–72.

116. In the fall of 1994, after the defendants learned of the possibility of litigation in this case, senior staff employees began requiring PTE participants to sign a letter stating that they were not participating in a job and that any payment that they received was a stipend to reimburse them for expenses, rather than a salary. *See* Moore Aff, ¶ 26; PE 27. For example, Philip Oberlan-der, a supervisor at the SSC, approached plaintiff Lee Springer, a PTE kitchen participant, and asked him to sign a document which essentially stated that the PTE work program was a training program. Oberlander allegedly threatened to fire Springer if he did not sign the document. *See* Springer Aff. ¶ 18; PE 24.

117. Oberlander and another senior SSC supervisor also asked plaintiff James Moore to sign the same document in the fall of 1994. Moore refused to sign the document, even though both supervisors allegedly "put considerable pressure" on him to sign the letter and warned him that he might be fired from the program if he failed to sign. *See* Moore Aff. ¶ 27.

### III. *Defendants' Status*

118. The defendants have at all relevant times been controlled by a common core of individuals. Peter Malkin is the chair of both the GCP and the 34th SP, and Daniel Biederman is President of both the GCP and the 34th SP. *See* Schaly Dep. at 43–44; Biederman Dep. at 195; Mandelker Dep. at 546.

119. The GCP's controller, David Schaly, has described the SSC as a "subsidiary" of the GCP. *See* Schaly Dep. at 28–29. The defendants' agent, Robert Hayes, has concluded that "the executive staff of these Partnerships [GCP and 34th SP] control[] the Grand Central Partnership Social Services Corporation." PE 32 at 10 n. 4.

120. The board of directors of the SSC for much of the period relevant to this action was composed of Biederman, Andrew Manshel, and Grunberg. *See* Biederman Dep. at 17, 19 (SSC board composed of Biederman, Manshel, and Grunberg between approximately 1992 or 1993 and Spring 1996). All three also hold positions with the GCP: Biederman as President of the GCP, Manshel as General Counsel of the GCP, and Grunberg as Vice President, Social Services of the GCP, a position he also held at the 34th SP. *See* Biederman Dep. at 8, 20, 98; Grunberg Dep. at 10.

121. GCP incorporated SSC, *see* PE 79 at 5, 6, and did so because the GCP wished to receive a grant from the City and the City

"told [the GCP] that to receive a grant for the operation of the Center at 44th street [they] would have to set up an independent corporation." Biederman Dep. at 50–51.

122. In a stipulation of facts jointly prepared and submitted to the court in *Kessler v. Grand Central District Management Association, Inc.,* 960 F.Supp. 760 (S.D.N.Y. 1997), by GCP and its adversaries, the SSC is described as "a not-for-profit corporation under the control of GCP until May 1996." PE 78.

123. On at least one occasion, the GCP rather than the SSC signed a contract with Chase to provide Chase with outreach services using PTE participants. *See* PE 80 (Letter Agreement signed by Jeffrey Grunberg as "Vice President, Grand Central Partnership"); *compare* PE 81 (Letter Agreement between Fleet Bank and SSC signed by Biederman as President of "Grand Central Partnership Social Services, Inc.") *with* Biederman Dep. at 8, 10, 14 (testifying that he is the President of GCP and the 34th Street SP but never held any position at SSC except as a board member).

124. The defendants' operations also overlap to a significant degree. For example, the defendants maintain executive offices at 6 East 43rd Street that are used by officers of all three defendants. *See* Biederman Dep. at 30–33; Crain Dep. at 11. In addition, for a time the defendants maintained an outreach office in the 34th Street area that served outreach administrators and participants for both the GCP and the 34th SP. *See* Weaver Dep. at 154; Flynn Dep. at 43; Mandelker Dep. at 544.

125. The defendants used the same pool of PTE participants to perform outreach and other activities in both the GCP and the 34th SP areas. *See* Schaly Dep. at 68–69; Mandelker Dep. at 26, 516, 541–42; Weaver Dep. at 126–29; Crain Dep. at 163–65. Moreover, both the SSC and the 34th SP use the drop-in center as a location to which clients are referred. *See* Crain Dep. at 26–27.

126. The defendants shared financial and executive services. The GCP and 34th SP held common budget meetings, *see* Biederman Dep. at 182, and shared the same con-

troller (David Schaly), Vice President for Social Services (Jeffrey Grunberg), Program Director (Brady Crain), and Associate Director (Ira Mandelker). *See* Schaly Dep. at 7, 140; Mandelker Dep. at 23, 25.

127. Every time the SSC desired funds to pay its PTE participants, it made a request to GCP or 34th Street. *See* Schaly Dep. at 37, 39, 41, 68–70. David Schaly, controller for GCP and 34th SP, also was "responsible for the accounting of SSC," Schaly Dep. at 28, and testified that it was GCP's practice to cover any debts of the SSC. *See* Schaly Dep. at 74–75, 122–24.

128. To obtain a HUD grant to be used by the SSC for additional homeless service provision, the GCP rather than the SSC submitted a proposal and handled the funds. *See* PE 83 ¶ 6 (Complaint in *Grand Central Partnership, Inc. v. Cisneros,* 96 Civ. 8238(LLS) (S.D.N.Y.)); HUD Report (PE 77).

129. All three defendants used a common form for payroll changes. *See* PE 84 (Employee Payroll and Authorization form) (for allocation of salary, form permits choice of GCP, SSC, 34th SP, or Bryant Park Restoration Corporation and provides space for Biederman's authorization as "President"); *see also* PE 85 (Salary Inception/Adjustment Chart) (same).

130. Robert Hayes has acknowledged that "[a]dministrative and management services are shared by the Grand Central Partnership and the 34th Street Partnership" and that the "Grand Central Partnership Social Services Corporation provides its services in association with both BIDs." Hayes Report at 9 (PE 32).

131. The GCP, SSC, and 34th SP all perform their related activities for the common business purpose of protecting the investments of Grand Central area property owners and enhancing business opportunities for local merchants. *See* Biederman Dep. at 36–42, 57–59, 74; PE 62 (34th SP Certificate of Incorporation at ¶ 4) (purposes of 34th Street Partnership include "to restore and promote business activity in the district" and "generally to stimulate economic growth in the City of New York").

132. Biederman, the President of the GCP and 34th SP, is among those who have stated that the GCP and 34th SP provide security, sanitation, capital improvements, and similar services in order to improve business for area merchants. *See* Biederman Dep. at 37; Anderson Dep. at 46–47 (purpose of GCP is "to keep the area ... business viable," to render it "clean and a good place to do work and do business").

133. Biederman has also admitted that the SSC uses its outreach participants to remove homeless people from the streets, and that it uses the drop-in center, which is supported by the maintenance, food service, and administrative activities performed by the plaintiffs, as a magnet to keep them off the streets, so that potential customers for area businesses feel safer and are thus more likely to patronize shops in the area. *See* Biederman Dep. at 41, 57–59, 124; Hayes Report at 13 (PE 32) (quoting Biederman as stating that interest of homeless advocates who work to bring people in off the streets is compatible with the interests of the business community). Grunberg also advertised the outreach department's ability to "clear the homeless" from area premises. PE 35. Moreover, Peter Malkin, chair of the GCP and 34th SP, has stated that in addition to being "part of business's 'social responsibility,'" the homeless constitute "a business problem." Hayes Report at 13 (PE 32) (quoting J. Barbanel, *Plan Seeks to Reduce Homeless at Terminal,* N.Y. Times, July 25, 1986).

134. GCP's own District Plan, the master plan required by law for every proposed BID that, *inter alia,* describes the services the BID plans to provide, lists as one of GCP's purposes the providing of "Social Services for Homeless Persons," PE 86 (District Plan for the Grand Central Business Improvement District ("GCP District Plan")) at 14, and describes the provision of services such as showers, social service referrals, and food—those that GCP uses SSC to provide—as part of GCP's purpose. *See* GCP District Plan at 14–15 (PE 86). The 34th Street District Plan similarly describes the provision of "social services, including aid to the homeless"—for which the 34th SP uses SSC—as among the 34th SP's purposes. *See* District Plan for the 34th Street Business Improvement District ("34th Street District Plan") at 12 (PE 87). Furthermore, in a separate lawsuit GCP has emphasized that the services provided by SSC are intended to further 34th Street and GCP's goals of enhancing their districts, and that these goals were explicitly business related. *See* PE 88 (Grand Central District Management Association, Inc.'s Memorandum in Support of its Cross–Motion for Summary Judgment in *Kessler*) ("*Kessler* Summary Judgment Memorandum") at 19 ("Each of GCDMA's functions, 'including providing services to the homeless, is' related to attracting customers to the area's businesses, and making them want to return.") (quoting District Plan); *see also* 34th Street District Plan at 12 (PE 87) (34th Street's funding for homeless aid is provided "with the aim of improving the business environment in the District.").

135. The SSC also serves the public in competition with typical commercial entities. The SSC has marketed its outreach work to and performed such work for any number of corporations, from Chase Manhattan Bank ("Chase"), Fleet Bank and Citibank to the Blarney Stone pub to the Edward S. Gordon management company. *See* Paul Dep. at 13 (Lyn Paul is the second vice president of Chase Manhattan Bank); Anderson Dep. at 19–20, 48–59; Haddock Dep. at 29–30, 43–50; PE 22 (contract between SSC and Fleet Bank); PE 63; PE 31; Berger Aff. ¶¶ 7–8. The SSC has also contracted with 7th on 6th, the corporation that manages the biannual fashion show held in Bryant Park, to perform various tasks. *See* Biederman Dep. at 115–16, 120; PE 42–44. It also contracted with the Port Authority for PTE participants to perform recycling services at the World Trade Center. *See* Biederman Dep. at 66–67.

136. If not for the SSC contract, many of the above entities would undoubtedly have hired security companies to clear homeless individuals from their vestibules, front steps, and building overhangs, and temporary agencies or day laborers to provide services such as recycling or the setting up and removal of chairs for performances. In fact, Robert Anderson of Chase, formerly a substantial

SSC outreach customer, testified that Chase used outside security guards to handle homeless vestibule occupants before contracting with the SSC, and that it resumed using such guards as soon as it terminated its contractual relationship with the SSC. *See* Anderson Dep. at 14–27.

137. Both the GCP's president and the SSC's former program director and present associate director, Mandelker, have conceded that both the outreach and recycling programs constitute revenue-generating business enterprises. *See* Mandelker Dep. at 536–37.

138. Outreach was a particularly lucrative activity for the SSC. At the May 1995 Committee on General Welfare session before the New York City Council, Grunberg testified that the SSC's outreach contracts for 1995 were expected to generate revenues of approximately $840,000. *See* City Council Transcript at 130 (PE 47).

139. While some of the funds the SSC generated through its contracting activities were used to cover the expenses of the drop-in center, much of these revenues paid the salaries of the staff and officers of the SSC, including Grunberg. *See* Schaly Dep. at 83–85; City Council Transcript at 130–31 (PE 47) (SSC salaries consume "almost all" of the outreach funds).

140. According to Biederman, GCP sanitation crews used a number of items—"bags, brooms, shovels, pails, scrapers," "radios, books ... [and] flashlights"—some of which undoubtedly were moved from outside to within New York state in commerce. Biederman Dep. at 44. Similarly, SSC outreach participants all wore uniforms from the ATC Uniform Company, and used radios, clipboards, and similar supplies, some of which must also have moved in commerce. *See* Mandelker Dep. at 244, Flynn Dep. at 229.

141. As demonstrated by their annual filings with the State Attorney General's office, the GCP, 34th SP, and SSC each have earned revenues well in excess of $500,000 for nearly every year of their existence. For example, between 1989 and 1995, the GCP had annual revenues of between $2,448,477 and $8,342,205, *see* PE 64–68; between 1990 and 1994, the SSC had annual revenues of between $823,408 and $3,071,930, *see* PE 69–71; and in 1992, the 34th SP had annual revenues of $2,995,494, with its 1993 revenue rising to $6,174,215, *see* PE 72–73.

### CONCLUSIONS OF LAW

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331; 29 U.S.C. § 216; 28 U.S.C. §§ 2201 & 2202; and 28 U.S.C. § 1367.

I adopt herein any Finding of Fact previously set forth that might more properly be deemed a Conclusion of Law.

### I. FAIR LABOR STANDARDS ACT COVERAGE

Defendants essentially claim that they are not covered by the FLSA because: (1) they are not an enterprise engaged in interstate commerce or in the production of goods for interstate commerce; and (2) the plaintiffs are not employees of the defendants. For the reasons to be discussed, I disagree. First, the defendants acted as a common enterprise and engaged in interstate commerce. Second, the defendants treated the plaintiffs as classic employees for a classic employer purpose, *i.e.*, to make money. Under these circumstances, the plaintiffs were employees for purposes of the FLSA. To the extent that the defendants claim that the plaintiffs are trainees, they are asking this Court to disregard the Secretary's regulations and relevant case law.

The defendants are asking this Court to find *ex post facto* that the value of their program warrants an exemption from the obligations imposed by the FLSA. As noted in the beginning of this Opinion, Congress must create a statutory exemption or the defendants must persuade the Executive Branch to grant an exemption. It is not the function of this Court to legislate an exemption for the GCP, SSC, and 34th SP that does not otherwise exist in the statute, relevant case law or the Secretary's regulations.

### A. Enterprise Theory of Coverage

■ Plaintiffs' contention that the defendants are covered by the FLSA is premised

upon the enterprise theory, *i.e.*, that the plaintiffs are covered because during the relevant time period, they were employed in an enterprise "engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 203(s), § 206(a), and 207(a)(1). Such an enterprise:

> has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and ... [its] annual gross volume of sales made or business done is not less than $500,000 ....

29 U.S.C. § 203(s)(1)(A)(i) & (ii).

■ The FLSA provides, in relevant part, that the term, "[e]nterprise means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all activities whether performed in one or more establishments ...." 29 U.S.C. § 203(r). The three elements to be satisfied are: (1) related activities, (2) unified operation or common control, and (3) common business purpose. *See Brennan v. Arnheim & Neely*, 410 U.S. 512, 518, 93 S.Ct. 1138, 35 L.Ed.2d 463 (1973). The defendants meet all three elements.

### 1. Related Activities

■ Related activities are those which are "the same or similar," S.Rep. No. 145, 87th Cong., 1st Sess. 41, reprinted in 1960 U.S.Code Cong. & Ad. News 1620, or are "auxiliary or service activities." 29 C.F.R. § 779.206(a) (quoting *id.*). Auxiliary and service activities include generally "all activities which are necessary to the operation and maintenance of the particular business," such as warehousing, bookkeeping, or advertising. *Id.; see also id.* at § 779.208. When different business entities are involved, the critical inquiry is whether there is "'operational interdependence in fact.'" *Donovan v. Easton Land & Dev., Inc.*, 723 F.2d 1549, 1551 (11th Cir.1984) (quoting *Brennan v. Veterans Cleaning Serv., Inc.*, 482 F.2d 1362, 1367 (5th Cir.1973)). Entities which provide mutually supportive services to the substantial advantage of each entity are operationally interde-

pendent and may be treated as a single enterprise under the Act. *Dole v. Odd Fellows Home Endowment Bd.*, 912 F.2d 689, 692–93 (4th Cir.1990) (citing *Easton Land & Dev.*, 723 F.2d at 1551–52; *Veterans Cleaning Serv.*, 482 F.2d at 1366–67 (operational interdependence and shared public image of three separate corporations involved in the "cleaning business")).

Despite defendants' claim to the contrary, the defendants engaged in related activities. PTE participants performed outreach services in bank vestibules and private properties in both the Grand Central and 34th Street areas. *See* PE 82 (This GCP document states that "[t]wo of the [GCP's] many successful programs are the Outreach Program and the more recent Recycling Program. The Outreach Program employs homeless and formerly homeless people to reach out to their homeless peers in bank vestibules, private properties, and public spaces throughout New York City, to bring them indoors and connect them with social services .... Outreach is offered in the public spaces of the [GCP] and 34th Street Partnership catchment areas, and on a fee-for-service basis on private properties throughout New York City .... The income realized from these two services is in turn used to provide the many social services offered at the [GCP] Multi–Service Center and 34th Street Partnership Day Room."). PTE participants performed services for both GCP and 34th SP activities. *See* Biederman Dep. At 49 ("[T]here have been times when members of the PTE program performed tasks for GCP, like moving chairs for a concert."); Mandelker Dep. At 541–544 ("[S]ome of the [SSC] outreach staff members were on the payroll of the 34th Street Partnership .... There were [PTE participants] doing outreach in the 34th Street area .... [T]he [PTE] program was moved out of our building at 44th Street and to 34th Street .... [T]hey used offices at 34th Street and Eight Avenue for all of our outreach program ...."). The defendants' activities have a dual mission of business improvement and homeless services. *See* PE 77 at 15 (HUD Report stating that there are "inherent conflicts in GCP's dual mission of business im-

provement and services to the homeless."). The GCP and the 34th Street Partnership sought to benefit the businesses within their area and provide social services. The SSC had "the same or similar function" and the PTE Program was often a means of aiding the GCP and the 34th Street Partnership in providing these same services. Finally, and for the reasons set forth in paragraphs 117–140 *supra*, the SSC was dependent on the GCP and the 34th SP for a substantial part of the funds needed to operate the SSC. Consequently, the defendants provided mutually supportive services and were operationally interdependent.

2. Unified Operation or Common Control

■ The Secretary's regulations define "unified operation" as "combining, uniting, or organizing [related activities'] performance so that they are in effect a single business unit or an organized business system which is an economic unit directed to the accomplishment of a common business purpose." 29 C.F.R. § 779.217. "Control" is the power to "direct, restrict, regulate, govern, or administer the performance" of the related activities, and "common control" exists "where the performance of the described activities are controlled by one person or by a number of persons, corporations, or other organizational units acting together." *Id.* § 770.221. While ownership may be an important factor in determining common control, the focus of the inquiry is the performance of the related activities. *Odd Fellows Home Endowment Bd.*, 912 F.2d at 693. Common control of performance may be established in the absence of common ownership. *See id.* §§ 779.222, 779.244.

Again, despite defendants' claim to the contrary, the defendants clearly constitute a unified operation, and there is a core group of individuals that control the three entities—the GCP, the 34th Street Partnership, and the SSC. *See* paragraphs 117–140 *supra*. As noted, the GCP incorporated the SSC. *See* PE 79 at 5,6. In an action before another judge of this Court, the GCP admitted control over the SSC. *See* PE 78 ("The ... [SSC,] ... a not-for-profit corporation under the control of GCP until May 1996 is a not-

for-profit corporation partially funded by GCP."). Judge Schira Scheindlin found in *Kessler v. Grand Central District Management Association, Inc.*, 960 F.Supp. 760 (S.D.N.Y.1997), that the "GCP itself, or through the Grand Central Neighborhood Social Services Corporation ("GCNSSC"), provides various social services to the homeless in the District, including outreach services, drop-in centers, and job training. The predominate concern ... in providing social services, is to help the business environment in the District, although these services also serve the purpose of helping the homeless." *Id.* at 764 (citations omitted). Thus, the defendants themselves have admitted that for the relevant period, the SSC was controlled and partially funded by the GCP. *See also* paragraphs 118, 120, 121 and 126 *supra*.

This control is also evidenced by the manner in which contracts with the SSC were handled. For example, the GCP, rather than the SSC, signed the contract with Chase Manhattan Bank ("Chase") to provide Chase with outreach services using PTE workers. *See* PE 80 (Agreement signed by Jeffrey Grunberg in his capacity as Vice President of the GCP). The Agreement between the SSC and the Fleet Bank to provide outreach services is signed by Daniel A. Biederman, in his capacity as President of the SSC. Biederman has stated, however, that he was the president of the GCP and the 34th SP, but that he never held any position at the SSC except as a board member. *See* Biederman Dep. at 8, 10, 14.

As described more fully in paragraphs 117–140 *supra*, the defendants also shared executive and financial services. Daniel Biederman was the President of the GCP and the 34th Street Partnership, and a board member of the SSC. Jeffrey Grunberg was the Vice President of the GCP and the Executive Director of the SSC. *See* Grunberg Dep. at 10–11 ("[M]y first position with [GCP] was as vice president, when the [SSC] was formed I was named as executive director .... But as a vice president, it was my understanding that should the [SSC] not be in existence, I would continue to oversee social services as a vice president for the [GCP].") The GCP and the 34th SP shared

the same controller (David Schaly), Program Director (Brady Crain), and Associate Director (Ira Mandelker). *See* Schaly Dep. at 7, 140; Mandelker Dep. at 23, 25.

Robert Hayes, the defendants' agent, has stated that "[a]dministrative and management services are shared by the [GCP] and the [34th SP]" and that the "[SSC] provides its services in association with both BIDs." PE 32 at 9. For example, the GCP and the 34th SP held common budget meetings. *See* Biederman Dep. at 182. In addition, the defendants shared office space. The office of the GCP is located at Six East 43rd Street. *See* Biederman Dep. at 30. Jeffrey Grunberg, the Executive Director of the SSC, "used an office in the GCP offices at 43rd Street." *Id.* at 32. The 34th SP "pays a share of the rent for the [GCP] Six East 43rd Street office." *Id.* at 33. Further, if need arose, the SSC would make requests to the GCP or 34th SP in order to pay PTE participants. Schaly, controller for the GCP and 34th SP, was also "responsible for the accounting of SSC," Schaly Dep. at 28, and testified that the GCP and the 34th SP contributed to the payment of PTE participants. *See* Schaly Dep. at 37, 39, 41, 68–70 ("[34th SP contributed to the SSC] in the same way that GCP [sic]. I have a request for payment of PTE and I make the payment."). The GCP would also cover the debts of the SSC. *See* Schaly Dep. at 74–75 ("[SSC] has a deficit and GCP contributes not only the intended amount but by default it covers all the expenses of Social Service Corporation, including the deficit.").

█ As another Court has noted, "[t]he test is not the day-to-day control of the [establishments] but whether there is a common control center with the ultimate power to make binding decisions for all the units of the enterprise. 'Common control' may exist … despite the separate management of the individual establishments." *Dole v. Bishop,* 740 F.Supp. 1221, 1225 (S.D.Miss.1990) (citing *Shultz v. Morris,* 315 F.Supp. 558, 564 (M.D.Ala.1970), *aff'd sub nom., Hodgson v. Morris,* 437 F.2d 896 (5th Cir.1971)). In this action, although there may have been separate management of the three entities, there was a common control center consisting of the few individuals who held executive positions in one or more of the entities and had the ultimate power to make binding decisions for the GCP, 34th SP, and SSC. Under these circumstances, I conclude that this portion of the test for a common enterprise is met.

3. Common Business Purpose

In *Tony and Susan Alamo Found. v. Secretary of Labor,* 471 U.S. 290, 295, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985), the Supreme Court stated: "Activities of [an] eleemosynary … organization may be performed for a business purpose. Thus, where such organizations engage in ordinary commercial activities … the business activities will be treated under the Act the same as when they are performed by the ordinary business enterprise." (citing 29 C.F.R. § 779.214).

Defendants claim that the SSC, GCP, and 34th SP do not share a common business purpose because "[t]he PTE program is not intended to enhance the district in which activities are performed." However, the entities did share a common business purpose, for the services provided by the SSC were intended to further the 34th SP and GCP's goals of improving and enhancing the conditions of their districts, and these goals, therefore, are business related. *See* PE 32 9 (Robert Hayes concluded that the SSC provided "services in association with [the GCP and the 34th SP]."). The GCP's express purpose is "attracting customers to the area's businesses, and making them want to return." *See* PE 88 (Grand Central District Management Association, Inc.'s Memorandum in Support of its Cross–Motion for Summary Judgment in *Kessler* ) at 19. The GCP's District Plan sets forth various objectives such as: (1) a supplemental security plan in order to "improve the business environment." PE 86 (GCP District Plan) at 11, (2) additional sanitation services "to make the district's streets and sidewalks … the cleanest of any *commercial* district in New York." *Id.* at 13 (emphasis added), and (3) offering services "such as showers, social service referrals, legal and medical assistance, warm drinks and some food" so that the district can "assist both the homeless *and* the *neighborhood's business environment.*" *Id.*

at 15 (emphasis added). The 34th SP District Plan has similar objectives including using special assessments from property owners to fund services—"including aid to the homeless"—"with the aim of improving the business environment in the District." PE 87 (34th SP District Plan) at 12. Daniel Biederman testified that he was "totally sold on the fact that helping the homeless ... would help the neighborhood." Biederman Dep. at 57.

In that manner, the SSC, the GCP, and 34th SP shared a common business purpose—providing service at a fee to improve business operating conditions. The SSC regularly entered into contracts and solicited business from private corporations promising that it would supply formerly homeless persons to act in a security capacity. *See* PE 31 (Letter from Frank Schiazza, Associate Director of the SSC, to Citibank) ("The most important task we can perform for Citibank is to provide an outreach/*security professional* that is well trained and motivated to perform their duties .... Our goal is to immediately assist you with the homeless problems in your ATMS [sic]. Currently, we are performing these services for: Chemical Banking, Chase Banking, Marine Midland, Commercial Banking, Republic Banking, Bankers Federal, Dime Savings Bank, Philip Morris Inc., and E.S. Gordon & Company. *Our program will give you the level of protection that we have come to understand you must have in your ATMS* [sic] *to present a safe environment to customers.*") (emphasis added); PE 35 (Letter from Jeffrey Grunberg to Olympia & York ("Our standard service for outreach is $5.50 per hour .... Our monthly fee for this service would be $1,906.00 .... *Our goal is to immediately clear up the plaza area and future encampments of homeless ..... Our program will give you the level of protection that we have come to understand you must have in the plaza to present a safe environment to the tenants of your building.*") (emphasis added). Based upon the foregoing, I conclude that the SSC, the GCP, and the 34th SP shared a common business purpose.

Because the plaintiffs have satisfied all three elements of 29 U.S.C. § 203(r), I find that the SSC, the GCP, and the 34th SP constitute a common enterprise for purposes of the FLSA.

**B. The Interstate Commerce Requirement**

The FLSA states that its requirement that the enterprise be "engaged in commerce or in the production of goods for commerce" is met by a showing that the enterprise has employees "engaged in commerce or in the production of goods for commerce or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and ... [has] annual gross volume of sales made or business done [] not less than $500,000." 29 U.S.C. § 203(s). The term "commerce" refers to interstate commerce. *See* 29 U.S.C. § 203(b). Under an "enterprise" application, a plaintiff need not himself or herself be involved in an activity which affects interstate commerce. *See Radulescu v. Moldowan*, 845 F.Supp. 1260 (N.D.Ill.1994). If the gross volume requirement is met, all employees are covered under the Act if some are (1) engaged in commerce, (2) engaged in the production of goods for commerce, or (3) engaged in handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce. *See id.*

Defendants argue that the plaintiffs claims fail because the SSC is not engaged in interstate commerce. *See* Def.'s Tr. Mem. at 12. The question is, however, whether the enterprise consisting of the SSC, the GCP, and the 34th SP is an enterprise with employees engaged in commerce or in the production of goods for commerce within the provisions of the FLSA.

**1. Engaging in Commerce**

In *Tony and Susan Alamo Found.*, the Supreme Court further observed that "[t]he statute contains no express or implied exception for commercial activities conducted by religious or other nonprofit organizations." *Tony and Susan Alamo Found.*, 471 U.S. at 297 (footnote omitted). It noted further that there was "broad congressional consensus that ordinary commercial businesses should not be exempted from the Act simply because they happened to be owned by reli-

gious or other nonprofit organizations." *Id.* at 298 (footnote omitted). The Court focused on the fact that the Foundation's businesses serve[d] the general public in competition with ordinary commercial enterprises, and the payment of substandard wages would undoubtedly give petitioners and similar organizations an advantage over their competitors. It is exactly this kind of 'unfair method of competition' that the Act was intended to prevent, and the admixture of religious motivations does not alter a business's effect on commerce.

*Id.* at 299 (citations omitted).

In this instance, it is clear that the defendant's outreach programs in the security and recycling areas serve the general public in competition with ordinary commercial enterprises, and that the payment of substandard wages gives them an unfair advantage in commercial activity. Because the defendants paid the PTE participants only $1 an hour, they were able to offer security services to banks and other private corporations at a significant discount. The defendants entered the economic arena and competed against other organizations for economically beneficial contracts. *Compare Wagner v. Salvation Army*, 660 F.Supp. 466, 468 (E.D.Tenn. 1986) (holding that a transient lodge did not enter the economic arena because it did not serve the general public and compete with other private entrepreneurs). If not for the SSC's use of PTE participants, some banks, like Chase had before and after its contract with SSC, would have selected other organizations to provide security services. *See* Anderson Dep. at 14–27; *see also* paragraph 135 *supra.* Similarly, the non-for-profit organizations that had contracted with the Port Authority for recycling services before the SSC had also paid their workers minimum wages. Thus, I find that the defendants were an enterprise that engaged in commerce.

2. Engaged in Handling, Selling, or Otherwise Working on Goods or Materials that Have Been Moved in or Produced for Commerce

A clear understanding of this issue requires an examination of prior congressional

interpretation of § 203(s), the specific statutory provision at issue in this case. Prior to the 1974 amendment, the section provided:

> Enterprise engaged in commerce or in the production of goods for commerce means an enterprise which has employees engaged in commerce or in the production of goods for commerce, including employees handling, selling or otherwise working on goods that have been moved in or produced for commerce by any person, and which ... is an enterprise ... whose annual gross volume of sales is not less than $250,000.

As amended, Pub.L. No. 93–259, now reads:

> Enterprise engaged in commerce or in the production of goods for commerce means an enterprise which has employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and which ... is an enterprise ... whose annual gross volume of sales is not less than $250,000.[2]

The issue is what Congress intended by substituting the word "or" for "including," by adding the words "or materials," and by consisting using the word "handling." Most courts addressing this issue have relied on the Senate Report on the Fair Labor Standards Amendments of 1974. They quote the Report as evidence of Congress's intent to include within the definition of "enterprise engaged in commerce or in the production of goods for commerce," businesses whose employees use materials that have at some point moved in interstate commerce. *See Marshall v. Brunner*, 668 F.2d 748 (3rd Cir. 1982); *Marshall v. Davis*, 526 F.Supp. 325 (M.D.Tenn.1981); *Marshall v. Baker*, 500 F.Supp. 145 (N.D.N.Y.1980); *Marshall v. Whitehead*, 463 F.Supp. 1329 (M.D.Fla.1978).

The Report states:

> In addition to expanding coverage, the bill amends section 3(s) by changing the word

---

**2.** The annual gross volume requirement was amended in 1989 and is now $500,000.

"including" to "or" to reflect more clearly that the "including" clause was intended as an additional basis of coverage. This is, in fact, the interpretation given to the clause by the courts. The bill also adds the word "or materials" after the word "goods" to make clear the Congressional intent to include within this additional basis of coverage the handling of goods consumed in the employer's business, as, e.g., the soap used by a laundry. The "handling" language was added based on a retrospective view of the effect of substandard wage conditions.

Senate Report No. 93–690, 93rd Congress, 2d Session at 17 (1974).

The Report concludes that:

Although a few district courts have erroneously construed the "handling" clause as being inapplicable to employees who handle goods used in their employer's own commercial operations, the only Court of Appeals to decide this question, and the majority of the district courts, have decided otherwise, and the additions of the words "and materials" will clarify this point.

*Id.*

The court in *Brennan v. Jaffey,* 380 F.Supp. 373 (D.Del.1974), faced with the applicability of the 1974 amendment to an apartment complex whose maintenance personnel used supplies that had moved in interstate commerce, stated:

The 1974 Report however, is of considerable significance in ascertaining what was intended when the amendment became effective on May 1, 1974, by inserting the word "materials" in section 203(s). It clearly discloses a legislative purpose to make ... the provisions of the Act applicable to employers, such as the defendants, after its effective date. Its actual effect was therefore to expand its future coverage ....

*Brennan v. Jaffey,* 380 F.Supp. at 379.

This legislative history clearly demonstrates that Congress intended to extend the coverage of the FLSA to companies that use products that have moved in interstate commerce. As the court in *Marshall v. Baker* observed:

Senate Report No. 93–690 makes clear that the addition of "materials" after the word "goods" signified the congressional intent to bring within that additional basis of coverage those businesses which handle products consumed in the course of their operations. The example provided by the Senate itself puts to rest any question of the applicability of the statute to the defendants: *if a local laundry is covered because the soap which it uses moved in interstate commerce, then an apartment complex is covered because the materials used by its maintenance personnel moved in interstate commerce.*

*Marshall v. Baker,* 500 F.Supp. at 151 (emphasis added).

Furthermore, "[t]his amendment adding the words 'or materials' leads to the result that virtually every enterprise in the nation doing the requisite dollar volume of business is covered by the FLSA." *Dunlop v. Industrial America Corp.,* 516 F.2d 498, 501–02 (5th Cir.1975).

Since 1974, courts facing the issue presented here have unanimously come to the same conclusion: local business activities fall within the reach of the FLSA when an enterprise employs workers who handle goods or materials that have moved or been produced in interstate commerce. *See Dole v. Odd Fellows Home Endowment Board,* 912 F.2d 689, 695 (4th Cir.1990); *Donovan v. Pointon,* 717 F.2d 1320, 1322–23 (10th Cir.1983); *Marshall v. Brunner,* 668 F.2d 748, 752 (3rd Cir.1982); *Donovan v. Scoles,* 652 F.2d 16 (9th Cir. 1981), *cert. denied,* 455 U.S. 920, 102 S.Ct. 1276, 71 L.Ed.2d 460 (1982); *Dole v. Bishop,* 740 F.Supp. 1221, 1225 (S.D.Miss.1990); *Conway v. Takoma Park Volunteer Fire Dept.,* 666 F.Supp. 786, 791 (D.Md.1987); *Marshall v. Davis,* 526 F.Supp. 325, 328 (M.D.Tenn. 1981); *Marshall v. Baker,* 500 F.Supp. 145, 151 (N.D.N.Y.1980); *Marshall v. Whitehead,* 463 F.Supp. 1329, 1336–38 (M.D.Fla.1978).

In this instance, GCP sanitation crews used a number of items—"bags, brooms, shovels, pails, scrapers ... radios, books ... [and] flashlights", Biederman Dep. at 44, some of which undoubtedly moved in interstate commerce to New York City. Similarly, SSC outreach participants wore uniforms,

and used radios, clipboards, and similar supplies, some of which must also moved in interstate commerce. *See* Mandelker Dep. at 244; Flynn Dep. at 229. Thus, I find that this prong of the FLSA is satisfied because the plaintiffs engaged in handling goods or materials that have moved in or were produced for commerce—by using these materials while working in the different program areas.

### 3. Gross Volume Requirement

The final requirement for finding that an enterprise is engaged in commerce or the production of goods for commerce is that the enterprise has an "annual gross volume of sales made or business done [that] is not less than $500,000." 29 U.S.C. § 203(s). The GCP, the 34th SP, and the SSC each have earned revenues well in excess of $500,000 for nearly every year of their existence. As noted previously, between 1989 and 1995, the GCP had annual revenues of between $2,448,477 and $8,342,205, *see* PE 64–68; between 1990 and 1994, the SSC had annual revenues of between $823,408 and $3,071,930, *see* PE 69–71; and in 1992, the 34th SP had annual revenues of $2,995,494, with its 1993 revenue rising to $6,174,215, *see* PE 72–73. These amounts for business done by the defendant clearly exceed the statutory requirement of $500,000, and thus satisfy the gross volume requirement.

Based upon the foregoing, I find that the plaintiffs have satisfied the interstate commerce requirement of the FLSA.

### C. Employees Under the FLSA

▮ The term "employee" is defined in the FLSA as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The term "'employ' includes to suffer or permit to work." 29 U.S.C. § 203(g). At base, "the test of employment under the Act is one of 'economic reality.'" *Tony & Susan Alamo Found.*, 471 U.S. at 301 (citing *Goldberg v. Whitaker House Cooperative, Inc.*, 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961)). The question in this case is whether the plaintiffs were employees of an enterprise consisting of the SSC, the GCP, and the 34th SP, and thereby are covered by the minimum wage and overtime provisions of the FLSA, or are trainees and not entitled to such protection.

While the FLSA does not define "trainees," nor specifically provide that trainees are not employees for minimum wage purposes, the Supreme Court in *Walling v. Portland Terminal Co.*, 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947), held that trainees are not employees under the Act during their training period. Concluding that the trainees' employment in *Walling* did not "contemplate ... compensation," and that the employer did not receive any "'immediate advantage' from any work done by the trainees," the Court ruled that the trainees did not fall within the definition of an "employee." *Id.*, 330 U.S. at 153.

After *Portland Terminal*, the Wage and Hour Division of the Department of Labor issued a six-part test to guide the determination of whether a trainee is in fact an employee. The test, in relevant part, states:

Whether trainees or students are employees of an employer under the Act will depend upon all of the circumstances surrounding their activities on the premises of the employer. If *all* of the following criteria apply, the trainees or students are not employees within the meaning of the Act:

(1) the training, even though it includes actual operation of the facilities of the employer, is similar to that which would be given in a vocational school;

(2) the training is for the benefit of the trainees or students;

(3) the trainees or students do not displace regular employees, but work under their close observation;

(4) the employer that provides the training derives no immediate advantage from the activities of the trainees or students; and on occasion his operations may actually be impeded;

(5) the trainees or students are not necessarily entitled to a job at the conclusion of the training period; and

(6) the employer and the trainees or students understand that the trainees are not entitled to wages for the time spent in training.

*Wage & Hour Manual* (1980); *see also Donovan v. American Airlines, Inc.,* 686 F.2d 267, 273 n. 7 (5th Cir.1982).

These factors are not exhaustive and are intended to be consistent with *Portland Terminal* and the companion case of *Walling v. Nashville Chattanooga & St. Louis Ry.,* 330 U.S. 158, 67 S.Ct. 644, 91 L.Ed. 816 (1947). *McLaughlin v. Ensley,* 877 F.2d 1207, 1211 (4th Cir.1989). Under the *Portland Terminal* and the Wage and Hour test, the findings a court must make before reaching the legal question of whether trainees are employees are virtually identical. *Id.* Neither approach relies exclusively on a single factor, but instead requires consideration of all the circumstances. *Id.* The Wage and Hour Test is therefore a reasonable application of the FLSA and *Portland Terminal* and entitled to deference by this court. *Id.* (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).)

According to an expert report by Burt Barnow, "the PTE program did not constitute training for its participants . . . instead, PTE participants were employees of the defendants." PE 29 at 1. Barnow concluded that in none of the PTE Program areas—outreach, food services, maintenance, or administration—was training similar to what would take place in a vocational school. *See* PE 29. He also concluded that the outreach program probably did not meet the requirement that the employer that provides the training derive no immediate advantage from the activities of the trainees or students, and that the evidence was mixed on whether the PTE participants displaced regular employees, and whether the SSC and the PTE participants understood that the participants were not entitled to wages for the time spent in training .*See id.* at 16. With regard to the food services area, Barnow concluded that the evidence was mixed on whether the PTE participants displaced regular employees and whether the SSC did not receive any immediate advantage from the PTE Program. *See id.* at 18–20. With regard to the maintenance and administration departments, Barnow concluded that training was not for the benefit of the participant, but rather was "more of a work experience program with informal on-the-job training provided only as needed," *Id.* at 22, and that PTE participants displaced regular employees. *See id.* at 23.

Eric Roth, an additional expert for the plaintiffs, concurred with Barnow's findings. Roth found that:

> PTE participants, like prevocational workers, did not receive close supervision. For example, several plaintiffs who performed outreach as PTE participants testified that they were often left alone to perform their duties, and at least one of defendants' employees has testified that outreach supervisors were not always present when PTE participants were doing outreach work. While PTE participants in the administration department sometimes worked in the presence of a supervisor, they sometimes did not, as Jeffrey Grunberg has testified. For example, Ira Mandleker testified that the GCPSSC drop-in center's front desk was manned solely by a PTE participant. Similarly, according to defendants' testimony, PTE participants in food service and maintenance sometimes performed their work outside the presence of a single staff member.

> Unlike pre-vocational program participants, however, who are paid $5 to $6 per hour, PTE participants were paid at most $1.50 per hour, as explained earlier. Another difference, as discussed, is that PTE participants often stayed in the program for well over the six month maximum period prescribed for pre-vocational training . . . . I have seen no evidence in the plaintiff files I reviewed that specific, individualized goals were charted, as they would be in a pre-vocational training program, nor have I seen evidence of the systematic monitoring of progress, in light of the individual's goals, that should be performed in a proper pre-vocational program.

PE 30 at 13–14.

Defendant's expert report—prepared by William J. Grinker—devotes only three pages to the PTE Program, discusses the Program only in the most general terms, and fails to apply the Wage and Hour Test to the Program. *See* DE 4.

There is no doubt that the PTE participants would have had great difficulty in obtaining jobs in the private sector and as such, benefitted enormously from the work opportunities provided by the defendants. As homeless individuals, many of the plaintiffs needed to be instructed on the most basic of job skills: including avoiding absenteeism, being prompt for work, working a full day, and punching a time clock. Counseling provided by the defendants helped some of the plaintiffs obtain housing and employment outside the program. Unfortunately, determining that the training benefits the participants is only one part of the Wage and Hour Test. Despite counseling, orientation packets, and progress reports, in none of the departments—outreach, food service, maintenance, or administration—did the defendants receive training that is similar to or even close to that which would be provided in a vocational school. In addition, the Court finds that PTE participants did displace regular employees, and often did not work under any meaningful supervision. At times, PTE participants even supervised other PTE participants. PTE participants often worked significant overtime hours, and the defendants have admitted that their contracts could not have been fulfilled without the work of PTE participants.

Thus, even though the PTE participants received a benefit, the defendants gained an immediate and greater advantage from the PTE Program: the ability to offer security and other services at below market rates. The defendants gained further advantage because the SSC, the GCP, and the 34th SP all utilized the services of PTE participants. Also, for reasons to be discussed below, I find that the participants did not understand that they were not entitled to wages for the time spent in the Program. Although the defendants assert that the Wage and Hour Test is not determinative of whether a person is an employee under the FLSA, it is a factor to be weighed in the analysis, and the defendants have failed to show that under the six-factor test, the PTE participants were trainees rather than employees.

Two important elements in determining the "economic reality" of an employ-ment situation are whether there was an expectation or contemplation of compensation and whether the employer received an immediate advantage from any work done by the individuals. *See Tony & Susan Alamo Found.*, 471 U.S. at 300 (citing *Portland Terminal*, 330 U.S. at 153). For example, in *Tony & Susan Alamo Found.*, the individuals who worked in the Foundation's businesses, like the trainees in *Portland Terminal*, expected *no* compensation for their labors. *Id.* The District Court in *Tony & Susan Alamo Found.* found that the Secretary had "failed to produce any past or present associate of the Foundation who viewed his work in the Foundation's various commercial businesses as anything other than 'volunteering' his services to the Foundation." *Id.* (citing *Donovan v. Tony & Susan Alamo Found.*, 567 F.Supp. 556 (W.D.Ark.1982)). In this case, instead, the record clearly reflects that the plaintiffs expected compensation for their services. In contrast to *Tony & Susan Alamo Found.*, in which none of the individuals expected compensation for their services, and were true volunteers, the defendants are unable to find any PTE participant to testify that she did not expect compensation for his or her work. In fact, the defendants were well aware that the PTE participants were keenly interested in the compensation, for one of their proposed findings states: "Some clients fear losing their stipends, and having to rely solely on public benefits to pay for their housing, and therefore have asked and been permitted to remain in the PTE program. A per diem program was also created to permit graduates to work in the Center on an as-needed basis at minimum wage to provide income until a graduate found full-time employment." Defendants Proposed Findings at ¶ 45 (citing Grunberg Dep. at 108–109). As noted previously, testimony from the plaintiffs clearly states that they participated in the program because they thought it was a job.

Defendants' documents indicate that the plaintiffs' expectation of compensation was not unfounded. While the defendants now characterize the PTE participants as trainees who received a stipend, a memorandum from Vincent Flynn to PTE participants in the

Outreach program, relates the "Objectives for it's [sic] employees," and refers to the PTE participants as employees. PE 61 ("Upon completion of the volunteer entry [of a least three weeks], the employee will elevate to our Work Program status for twelve weeks."). Performance evaluations for the PTE participants refer to them as workers and do not mention "training" or refer to the individuals as "trainees." *See* PE 48–50.

A former director of the Outreach program testified that he informed the outreach workers that they were to be paid on a weekly basis for their work. *See* Flynn Dep. at 120. The periods of time that the plaintiffs were required to work were called "shifts," and they had to "clock in and out" in order to get paid. *See* PE 7. Plaintiffs kept detailed payroll sheets to calculate the plaintiffs' hours, identical to records kept for staff employees. *See* PE 57–60. When the plaintiffs worked in excess of an eight hour shift or more than forty hours per week, the additional time was called "overtime." *See* PE 52. Overtime slips indicate that the plaintiffs worked overtime hours when an individual failed to show or additional coverage was needed, and that there were times when these overtime hours were worked during the "graveyard shift" (Midnight to 8 a.m.). *See id.* A PTE participant received time-and-a-half—$1.50—for an overtime hour.

Defendants assert that the plaintiffs had no expectation of compensation because some of the plaintiffs signed a "Letter of Agreement," stating that the signee would

attend at least three (3) training and/or motivational workshops per week .... understand that [she is] not an employee of GCPSSC, and any stipend [she] receive[s] for personal expenses related to [her] training is not considered a wage .... understand that [her] participation in the PTE program is voluntary and does not guarantee future employment with the Grand Central Partnership Social Services Corporation.

DE 17.

In addition to the testimony by certain plaintiffs that they were coerced into signing the Letter of Agreement, the Supreme Court has clearly stated that: "protestations, how-

ever sincere, cannot be dispositive .... If an exception to the [FLSA] were [sic] carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the [FLSA]." *Tony & Susan Alamo Found.*, 471 U.S. at 301–02 (citations omitted). Further, the Agreement itself is dubious on its face, because there is no space indicating the date on which the Agreement was signed between the parties. This factor undermines the persuasiveness of the Letter Agreements because there appear to be no letter agreements from PTE participants who left the program before 1994, when the defendants first learned that a lawsuit was being contemplated.

As a result, any reliance the defendants place on the "Letter of Agreement" or an earlier "agreement" stating that an individual's "stipend for the entire 12 weeks is $40.00 per week," PE 20, is not appropriate in this case. Under the Supreme Court's analysis, neither are the Agreements dispositive in this case. The "Letter of Agreement" bears a strong resemblance to certain factors of the Wage and Hour Test, and appears to have been instituted after the possibility of a lawsuit became real. The prior "agreement" contains none of the relevant language that is present in the "Letter of Agreement." *See* PE 20. Further, the prior "agreement" instead supports the plaintiffs' expectation of weekly compensation as part of a job. *See id.* ("[The] stipend for the entire 12 weeks is $40.00 per week .... I understand that if my [the participant's] attendance is 95% or better, I will be *awarded a bonus of $160.00.*") (emphasis added).

If a defendant gains an immediate advantage from a plaintiff's labor, courts have held that the plaintiff is an employer for purposes of the FLSA. *See McLaughlin v. Ensley*, 877 F.2d at 1209–10 ("In sum, this court has concluded that the general test used to determine if an employee is entitled to the protections of the [FLSA] is whether the employee or the employer is the primary beneficiary of the trainees' labor .... The trainees were taught only simple specific job functions re-

lated to [defendant's] own business .... [T]he skills learned were either so specific to the job or so general to be practically no transferable usefulness."); *Donovan v. New Floridian Hotel, Inc.,* 676 F.2d 468, 471 (11th Cir.1982) (stating that the district court in the case found that mental patients did work which was of "economic benefit" to the defendants and that the individuals were employees for purposes of the FLSA and entitled to back wages for their work).

In examining whether the defendants here received an immediate advantage from any work done by the plaintiffs, the Court does not disregard the fact that the plaintiffs received certain advantages as well—such as basic job skills and the ability to create an employment history. But, it is also clear that the defendants could not have met their contractual obligations without the PTE program. As noted, without the PTE program, the defendants would have had great difficulty in meeting the obligations of the district plans of the GCP and the 34th SP. Further, the defendants would have not met the requirements of their contract with New York City—a contract which requires the defendants to handle food services for clients and provide maintenance at the drop-in center. *See* Findings of Fact ¶ 8. In addition, without the PTE participants, the defendants would not have been able to service the recycling and outreach contracts. According to a former director of the Outreach Program, there were only twenty-two staff members, but sixty-three program workers. *See* PE 41. The director stated that: "[e]ven if they [PTE participants] all showed up to work we did not have enough personnel to cover every location. Even the overtime did not -over [sic] all the locations." PE 41.

Finally, while the defendants did offer counseling sessions, it is difficult to envision that someone who is working a forty-hour week and also working the "graveyard shift" for overtime would be able to attend and benefit from those sessions. If the defendants truly intended primarily to provide a training program for the defendants, they would have either not allowed such overtime or scheduled counseling sessions to better accommodate those whose overtime included such shifts.

The plaintiffs have presented voluminous evidence that they performed productive work for the defendants, expected to be paid by the defendants, and produced more benefits for the defendants than they received through training provided by the PTE Program. Considering all the factors—including the Wage and Hour Test, expectation of compensation, and immediate advantage to the employer—the economic reality is that the PTE participants benefitted from the defendants' efforts, but the defendants benefitted more. The plaintiffs have satisfied each of the factors required to prove that they were employees and not trainees as that term is understood in case law. As a result, I conclude that the plaintiffs were employees of the defendants for purposes of the FLSA.

## II. NEW YORK MINIMUM WAGE ACT

The New York State Minimum Wage Act "constitutes remedial legislation designed to relieve the financial hardship experienced by persons employed in occupations 'at wages insufficient to provide adequate maintenance for themselves and their families.' " *In re Settlement Home Care, Inc. v. Industrial Bd. of Appeals of Dept. of Labor,* 151 A.D.2d 580, 581, 542 N.Y.S.2d 346, 347 (2d Dep't 1989) (citing N.Y. Labor Law § 650). It is to be liberally construed so as to permit as many individuals as possible to take advantage of its benefits. *Id.* at 581, 542 N.Y.S.2d at 347–48. Under the Act, an employee includes any "individual employed or permitted to work by an employer in any occupation," with the exception of a few narrow categories. N.Y. Labor Law § 651(5). An employer includes any "individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons acting as employer." N.Y. Labor Law § 651(6). Defendants do not assert that they are covered by any of the exemptions under the Act.

Defendants place special emphasis on *Albany College of Pharmacy v. Ross,* 94 Misc.2d 389, 404 N.Y.S.2d 779 (Sup.Ct.1978), for their claim that the plaintiffs are not entitled to the minimum wage under the New

York Labor Law. In *Ross*, the issue was whether pharmacists who supervised students placed with them by a college-administered professional practice program were "employers." Relying on the four common-law elements of a master-servant relationship—selection and engagement of the servant, the payment of wages, the power of dismissal, and the power of control of the servant's conduct—the court held that the individual pharmacists were not employers because the colleges, not the pharmacists, "directed, controlled, monitored and evaluated" the students. *Id.* at 390, 404 N.Y.S.2d at 780.

Apart from the fact that in the instant case the PTE participants worked for the defendants and thus *Ross* is not applicable, *Ross* is instructive because it states that the element of control is part of an employment relationship. *See id.* at 391, 404 N.Y.S.2d at 781. Defendants exercised control over the plaintiffs, selecting which persons participated in the program. *See* Grunberg Dep. at 111–15. Further, the defendants have stated that "*anyone* found under the influence of drugs and/or alcohol ... [would] be dismissed automatically from the program." DE 18. As a result, even under the *Ross* analysis, the plaintiffs are employers for purposes of the New York State Minimum Wage Act. Thus, I conclude that the defendants have violated the New York State Minimum Wage Act.

### III. STATUTE OF LIMITATIONS ARGUMENT

█ In their trial memorandum, defendants asked leave to amend their answer to assert the statute of limitations as a defense in this action under FRCP 15(a). At trial, the Court ruled upon one part of defendants' arguments. *See* Trial Transcript at 13 (denying "the motion to amend as futile, to the extent that all of this [revolves] around the one and only issue, i.e., are you an employer."). Here, the Court addresses the remaining defense arguments.

█ "The contention that all or part of an action is barred by the statute of limitations is an affirmative defense. If not raised by the defendant in his answer, it is waived." *Wade v. Orange County Sheriff's Office*, 844 F.2d 951, 955 (2d Cir.1988) (citing Fed.R.Civ.P. 8(c)); *see also Brock v. Wackenhut Corp.*, 662 F.Supp. 1482, 1487 (S.D.N.Y.1987) (statute of limitations period in the FLSA is a "procedural limitation on relief that must be pleaded as an affirmative defense"). Generally, permission to amend a complaint should be freely granted. *See Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). A court plainly has discretion, however, to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the other party. *See Tokio Marine & Fire Insurance Co. v. Employers Insurance of Wausau*, 786 F.2d 101, 103 (2d Cir.1986). The burden is on the party who wishes to amend to provide a satisfactory explanation for the delay. *See Sanders v. Thrall Car Mfg. Co.*, 582 F.Supp. 945, 952 (S.D.N.Y.1983), *aff'd*, 730 F.2d 910 (2d Cir. 1984).

The defendants' request to amend their complaint here was made after inordinate delay, in a memorandum on the eve of trial. Further, while raising the affirmative defense of statute of limitations, defendants have given *no* explanation whatsoever for their delay. Finally, I find that this amendment is not in the interest of justice because litigating this question at such a late date would cause the plaintiffs hardship and force them to spend additional resources. As a result, I deny the defendant's request to amend their complaint and find that the plaintiffs' claims are not barred by the statute of limitations.

### *CONCLUSION*

For the reasons discussed, I conclude that the defendants' practices violated the FLSA and the New York State Minimum Wage Act. I hereby order the Clerk of the Court to enter judgment for the plaintiffs on liability. I also award damages in the amount of the back wages to which the plaintiffs are lawfully entitled—i.e., the difference between the subminimum hourly rate at which the defendants compensated the plaintiffs and the lawful minimum wage for every hour worked up to 40 hours a week, and time-and-a-half for

every hour worked beyond 40 hours a week. In addition, I award plaintiff liquidated damages in an amount equal to the back wages due plaintiffs pursuant to 29 U.S.C. § 216(b). Finally, I order the defendants to pay plaintiffs their reasonable attorneys' fees and costs connected with this action. This matter is referred to the magistrate judge for an inquest on damages for each individual plaintiff consistent with his Order.

**SO ORDERED.**